## UNITED FIRE PROOF WAREHOUSE CO., Petitioner,

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent.

### No. 15221.

United States Court of Appeals
Seventh Circuit.

Feb. 1, 1966.

Herbert P. Wiedemann, Milwaukee, Wis., for petitioner.

Marcel Mallet-Prevost, Asst. General Counsel, Gary Green, Attorney, N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Richard S. Rodin, Attorney, N.L.R.B., for respondent.

Before HASTINGS, Chief Judge, DUFFY, Circuit Judge, and GRUBB, District Judge.

HASTINGS, Chief Judge.

United Fire Proof Warehouse Co. (United) has petitioned this court to review an order of the National Labor Relations Board requiring it, *inter alia,* to revoke unilateral wage changes, reinstate striking employees, and provide financial records to the union representing its employees, Chauffeurs, Teamsters & Helpers "General" Union, Local 200 (union).

Boulevard Storage & Movage Co., Inc., Irving Kirsch Corporation, Walsh Packing & Storage Co., and United (employers) are all Milwaukee-based Wisconsin corporations engaged in local and over-the-road moving and storing of household furniture and other goods.

In 1958, the union executed separate but identical agreements with the employers. In 1961, the four companies bargained with the union as a group. In December, 1963, after union notice that it desired to make certain changes in the contract, the four companies again agreed to form a multi-employer bargaining unit. This employer unit prepared a counterproposal and arranged with the union for a meeting on January 22, 1964.

At the January 22 meeting, the employers complained to the union that their non-union competitors in local moving were increasing and were operating at labor costs lower than their own. The employers stated they felt they could not grant a wage increase, but instead had decided to propose a wage decrease. Either at this meeting or at the next subsequent meeting on February 7, the employers made a counterproposal of a 19 cent per hour decrease in wages to the union proposal of a 50 cent per hour increase.

At the February 7 meeting, the employers gave the union figures relating to local moving. These figures, based on la-

bor cost and average general overhead costs in the industry, were offered by them to show they were making no profit in local moving.[1] Apparently, the employers attempted to keep discussions restricted to the local moving business and its lack of profit, refraining from comment on their overall business profit or loss. They did this notwithstanding the fact that their proposed wage decrease would apply to all of their employees, whether engaged in local or non-local moving.

The employers asserted that a part of their reason for desiring to discontinue the unprofitable practice which they had in the past tolerated was that, for the previous nine years, the union had promised to organize the non-union trucking industry in the area. The union had not done so, and many new and strongly competitive non-union companies had appeared in the area. The employers felt the competition prevented a rate increase. Wages thus became the target of economies.

The union negotiator, Kucera, testified that at the February 7 meeting and at meetings on February 19 and March 10, he requested permission to examine the financial records of any one of the employers in order that the union might have evidence of actual financial distress. He stated that they refused and said to him that the union "would have to take their word for it." This response, of course, if made, would permit the inference that the companies had justified their counterproposal by pleading inability to pay.

The companies' witnesses did not corroborate Kucera's testimony either as to what was said or as to when it was said. According to the employers' witnesses, any reference made to the employers' financial records was met by the response that the matter under discussion was the cost of local moving and not their overall financial position, which they claimed was not relevant. They further testified that the subject of employers' books was brought up in an uncertain fashion only once or twice.

The trial examiner, relying on the demeanor of the witnesses and upon the fact that the Board's general counsel failed to call other union representatives who had attended the meetings to corroborate Kucera's testimony, found that Kucera had in fact made a reference in two meetings to the union's desire to see the employers' records. He further found, however, that the employers responded by claiming that the records would not shed light on the issues, rather than stating that the union would have to take their word for it.

At a meeting on March 10, 1964, by which date the union had reduced its demand for a wage increase from 50 cents an hour to 15 cents, the employers offered to reduce their proposed wage decrease to 15 cents per hour. The union rejected this. The employers responded by notifying the union that the wage cut would be instituted on March 15. The following week, a wage cut of 15 cents per hour was made effective.

On April 7, the parties met, and the union requested permission to examine the employers' books, including their sales earnings, costs, and other pertinent information. The request was repeated by letter the following day.

The employers replied to the letter by again giving the labor cost and overhead information relating to local moving, and stated that none of the points they made required an audit of their books for verification.

At a meeting on April 23, the union rejected a group insurance proposal presented in the April 7 meeting, but offered to analyse the proposal and submit objections. The union then again requested

1. The figures given were as follows. Out of a $4.50 per man-hour charge to the customer, it cost the employers $2.64 per hour in basic wages to employees plus $.58 per hour in fringe benefits. Labor costs were calculated at 71% of the revenue dollar. Overhead for the industry was given as 29.6% of the revenue dollar. The total cost to the employers for local moving, therefore, was claimed to be 100.6% of the revenue dollar.

the financial records. This time, instead of responding as they had previously, the companies raised the problem of keeping their records secret. The union felt it could find some means of keeping the data of each individual company confidential. This meeting closed in the expectation of a future meeting.

On May 14, the beginning of the employers' busy season, the union struck all four companies. The parties met on May 25, and the employers offered to reinstate the wage rate which had existed prior to their cut, but the union demanded a wage increase.

By early July, all the companies but United had given in to the union demands.

The trial examiner recognized that employers may not, without violating § 8(a) (5) and (1) of the Labor Management Relations Act, 29 U.S.C.A. § 158, unilaterally take action on a mandatory subject of bargaining, such as wages, unless a genuine impasse, not caused by the failure of one of the parties to bargain in good faith, has been reached. Industrial Union of Marine & Shipbuilding Workers v. N.L.R.B., 3 Cir., 320 F.2d 615, 621 (1963).

The impasse which occurred apparently took place because of the employers' failure to produce data the union requested. Since the union members had been informed of the refusal to produce data prior to their strike vote, if the employers, had committed an unfair labor practice in refusing to give data, then the strike was in part an unfair labor practice strike and was protected. N.L.R.B. v. Wichita Television Corporation, 10 Cir., 277 F.2d 579, 584 (1960).

The trial examiner concluded, as explained *infra*, that the employers' refusal to furnish information was legitimate. He therefore found no violations of the Act and recommended dismissal of the complaint.

The Board, one member dissenting and adopting the view of the trial examiner, took the position that in substance the employers had claimed they were unable to do anything but reduce wages.[2] They had, therefore, raised the general issue of inability to increase wages.

The Board viewed the employers' position as an effort to isolate local moving from their total operations and to confine their wage dispute with the union to their local operations, although employees engaged in non-local moving were affected. The Board concluded that the employers had violated § 8(a) (5) and (1) of the Act by failing to bargain in good faith through refusal to furnish the union with overall financial data. Having drawn this conclusion, the Board found that a genuine impasse did not exist as of the date of the announcement of the wage cut. Consequently, the Board further concluded the employers' unilateral wage decrease was improper and that they had violated § 8(a) (5) and (1) of the Act by instituting the wage cut.

Finally, because of its resolution of the other issues, the Board found that the strike was caused and prolonged by the employers' unfair labor practices and that the striking employees were entitled to reinstatement.

Since all of the employers except United had settled the strike with the union, United was ordered to cease and desist from refusing to bargain collectively by refusing to furnish financial records relating to its overall operations and by instituting unilateral changes in wages or other terms or conditions of employment. United was further ordered, *inter alia,* to take the following affirmative action: furnish the union with financial records on request; revoke the unilateral wage changes; make whole its employees for any loss of pay they may have suffered by reason of the unilateral wage changes; and offer immediate and full reinstatement to its striking employees.

The employers' position with regard to furnishing financial data, as the trial examiner understood it, was that they felt that regardless of whether they were making an overall profit, or even assum-

---

**2.** The Board's decision and order are reported at 152 NLRB No. 51.

ing that they were, they were determined to decrease wages because of the loss of profit in local moving. In their view, their financial records were irrelevant, for no matter what they revealed, they still wished to make local moving profitable through an overall wage decrease. No matter how irrational the employers' position appeared to be as a reason for an overall wage cut, the trial examiner found that they had maintained this position earnestly and consistently. In such a situation, he reasoned, their respective financial records relating to the overall profitability of their businesses were irrelevant because, in effect, overall profit was never an issue or dispute between the union and the employers.

The trial examiner's findings with respect to Kucera's demands for financial records show that this was, indeed, the employers' position. The Board did not overturn these findings, but construed their import differently.

■ Generally, an employer who resists a proposed wage increase by reference to his own financial position must, in order to bargain in good faith, produce substantiating data upon request of his employees' bargaining representative. National Labor Relations Board v. Truitt Mfg. Co., 351 U.S. 149, 152–153, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). The essential question we must decide, therefore, is whether the Board's conclusion that the employers resisted a proposed wage increase by reference to their financial position is a reasonable interpretation of the facts and therefore supported by substantial evidence.

■ In assessing the substantiality of the Board's conclusions, whatever in the record fairly detracts from their weight, including the findings of the trial examiner, must be considered. Universal Camera Corp. v. National Labor Relations Bd., 340 U.S. 474, 496–497, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Indiana Rayon Corporation v. National Labor Relations Board, 7 Cir., 355 F.2d 535 (Jan. 26, 1966).

A review of the record as a whole indicates to us that the conclusion of the Board was not well founded. It is obvious that the employers wanted a wage cut in order to relieve the drain of subsidization of unprofitable local moving. But the testimony does not indicate that they contended they could not meet the wage increase requested, but rather that they simply would not meet it. Where the evidence disclosed "won't", the Board found "can't".

If the employers claimed that they were unable to pay, the union had a right to be shown evidence of inability. But when the employers refused to pay, the union knew all it was entitled to know. In such a situation, further financial information from the employers' records would be interesting and perhaps useful to the union, but not required; for such information cannot convert stubborn resolution into an excuse for failure to grant a wage increase or provide the basis for mutual bargaining concessions occasioned by a common understanding of financial plight.

■ We hold the Board's conclusion that the bargaining impasse between the union and the employers was speciously created by the employers' refusal, inconsistent with their duty to bargain in good faith, to give the union financial data is unsupported by substantial evidence on the record as a whole.

■ On oral argument, counsel for the Board suggested that if we did not uphold the Board in its conclusions that the employers' conduct prior to March 10, the refusal to furnish data and the unilateral wage decrease, constituted unfair labor practices, we could yet conclude that the employers' refusal to furnish the union with financial data after the April meetings was a failure to bargain in good faith. The union strike, then, would yet be an unfair labor practice strike and protected.

This suggestion would have been appropriate had our reservation to the Board's conclusions been dependent on a finding that the union had not made a clear and specific request for financial information prior to March 10. Concluding, as we have, that the employers

legitimately refused, under the circumstances of this case, to reveal financial information, it is not necessary to examine the union requests, which, in any event, we assumed to have been properly made. If the refusal to give financial data was proper prior to March 10, the record does not reveal any subsequent change which would have manifestly made the refusal improper thereafter.

Furthermore, the record indicates that the assumption that there was a refusal to give financial information after the April requests is weak. It appears rather that when the union struck, the employers contemplated giving the union the information it desired, provided the union could insure that the information would be treated confidentially. Substantial evidence does not support counsel's position.

For the foregoing reasons, the petition to review and set aside the Board order under consideration will be granted and the order of the Board will not be enforced.

Petition for review granted.

Enforcement denied.