**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HARVSTONE MANUFACTURING CORP., Duray Fluorescent Manufacturing Co., American Fluorescent Corp. and House-O-Lite Corp., Respondents.**

**No. 84–3116.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1985.

Decided March 6, 1986.

Rehearing and Rehearing En Banc
Denied April 10, 1986.

J. Elligers, Appellate Court Branch, N.L.R.B., Washington, D.C., for petitioner.

John T. Weise, Seyfarth, Shaw, Fairweather & Geraldson, Robert E. Fitzgerald, Jr., Chicago, Ill., for respondents.

Before WOOD and ESCHBACH, Circuit Judges, and SWYGERT, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

The National Labor Relations Board (the "Board") petitions this court for enforcement of its order against Harvstone Manufacturing Corp. ("Harvstone"), Duray Fluorescent Manufacturing Co. ("Duray"), American Fluorescent Corp. ("American") and House-O-Lite Corp. ("House-O-Lite") (collectively the "Respondents"). This action arises out of unfair labor practice charges filed against the Respondents by Local 134, International Brotherhood of Electrical Workers (the "Union"). The charges against the four Respondents were consolidated and, after a hearing, the Board ruled[1] that the Respondents had violated section 8(a)(5) and (1) of the National Labor Relations Act (the "Act"), as amended, 29 U.S.C. § 151, *et seq.*,[2] by bargaining in bad faith and by unilaterally changing various terms and conditions of employment prior to reaching a *bona fide* bargaining impasse. The Board's order was predicated on a finding that the Respondents had made a claim of "inability to pay" and failed, after appropriate Union request, to disclose financial data substantiating their claim. The Board determined that the Respondents' failure to disclose the requested financial records was itself bad faith bargaining that precluded the negotiating parties from reaching a *bona fide* impasse. By definition, therefore, the Respondents' unilateral changes in wages and other terms of employment were violative of the Act.

The primary issue before us, consequently, is whether there is substantial evidence in the record as a whole to support the Board's finding that the Respondents pleaded inability to pay. A tangential issue we must also decide is whether a cost-of-living adjustment in the collective bargaining agreements between the Union and the Respondents became effective and therefore due to be implemented prior to the expiration of the agreements. The Union argues that the adjustment had already accrued to the employees' benefit before the agreements expired and was therefore a permissive subject of bargaining over which a bargaining impasse could not lawfully be reached.

For the reasons stated below, we deny enforcement of the Board's order as it relates to Respondents Harvstone, American, and House-O-Lite and modify and enforce the order as it applies to Respondent Duray.

I.

The Respondents are all manufacturers of fluorescent lighting fixtures in the Chi-

---

1. The Board's decision and order are reported at 272 N.L.R.B. No. 144.

2. In pertinent part the Act provides:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \* \*

   (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
   29 U.S.C. § 158(a)(1) and (5).

cago area. Since 1964 the Respondents have recognized, bargained with and individually executed several collective bargaining agreements with the Union. The last of these agreements were three-year pacts that expired on August 31, 1982. The unfair labor practice charges which are the subject of this action arose out of negotiations between the Respondents and the Union beginning in August 1982. During these negotiations, all four Respondents were represented by Ray J. Schoonhoven. Although theoretically each bargaining session was limited to negotiations regarding one particular employer, the parties recognized that the final agreements between the Union and each Respondent would be substantially identical.

The Respondents came to the bargaining table seeking concessions from the Union claiming that they were operating at a competitive disadvantage relative to their counterparts in other portions of the United States. To substantiate their claim, the Respondents prepared a schedule comparing the wages and benefits paid by several of their competitors, also represented by the International Brotherhood of Electrical Workers, with their own labor costs. This schedule, which was given to the Union, purported to show that the costs paid by these competing manufacturers were significantly less than those incurred by the Respondents.

Armed with these figures, the Respondents met with Union representatives during pre-negotiation sessions during the spring and summer of 1982, and commenced actual negotiations toward new collective bargaining agreements on August 11 of that year. During these sessions, the Respondents proposed a reduction in wages, insurance and pension benefits, and the elimination of cost-of-living adjustment clauses. The Union, on the other hand, stated that it would make no concessions and, in fact, initially proposed a wage increase. Additionally, in response to the claims of competitive disadvantage, the Union sought the Respondents' financial records claiming that if the employers were predicating their bargaining stance on economic problems, they were required to produce substantiating data. The Respondents' only response was that they were not pleading inability to pay.

In total, the parties met eight times during August 1982, with the final session taking place on August 31, the day the collective bargaining agreements between the parties expired. Throughout these eight sessions, apart from the concessions the Respondents were seeking, another bone of contention was a cost-of-living adjustment which the Union claims accrued to the employees' benefit on August 30, 1982. The Respondents contend that the cost-of-living adjustment was not part of the expired collective bargaining agreements. During the life of the agreements, cost-of-living adjustments became effective each March 1 and September 1. The adjustments were based on reviews of the Bureau of Labor Statistics Consumer Price Index (the "CPI"). These reviews were to take place during each January and July immediately preceding the March 1 or September 1 effective dates. The Respondents contend that no adjustment was due on September 1, 1982, since the collective bargaining agreements expired prior to the time the adjustment was to become effective.

The parties were unable to resolve their differences, especially with respect to the cost-of-living adjustment issue, and after the August 31 meeting the parties did not meet again until November 8, 1982. The parties met several more times during November and December but failed to reach an accord. Although several negotiating sessions did take place after August 31, the parties do not contest the fact that, if we find the Respondents to have bargained in accordance with the Act, a *bona fide* impasse was reached on that date.

Following the expiration of the collective bargaining agreements, the Respondents instituted several unilateral changes including alteration of vacation schedules and elimination of paid five-minute wash-up periods, certain Christmas bonuses, gifts

and parties, and group insurance benefits for the dependents of employees. In addition, the Respondents never implemented the cost-of-living adjustment that the Union claims was due and payable. In December 1982, the Union filed unfair labor practice charges against the four Respondents individually. The four charges were consolidated and a hearing was held before an administrative law judge (the "ALJ") on June 28–30, 1983.

The ALJ ruled that the Respondents violated section 8(a)(5) and (1) of the Act by unlawfully making unilateral changes in wages and other terms and conditions of employment before a *bona fide* impasse had been reached and by, after pleading inability to pay, refusing to supply financial data requested by the Union. The ALJ determined that the cost-of-living adjustment had in fact accrued prior to the expiration of the collective bargaining agreements and that the adjustment was therefore a permissive subject of bargaining over which the Respondents could not lawfully bargain to an impasse. The ALJ also ruled that no *bona fide* impasse had been reached since the Respondents' bad faith refusal to supply financial information precluded their right to pronounce such an impasse.

The Board summarily affirmed the decision of the ALJ. Notably, however, the Board did not rely on the ALJ's conclusion with respect to the cost-of-living adjustment. Rather, the Board based its decision solely on the finding that the Respondents failed to bargain in good faith by refusing to disclose financial data after pleading inability to pay.

The Board ordered the Respondents, among other things, to cease and desist from the unfair labor practices found, to reinstate the terms of employment unilaterally changed by the Respondents (including the cost-of-living adjustment),[3] to compensate the employees for losses sustained as a result of the unilateral changes, to make the Respondents' financial records available to the Union and to bargain in good faith with the Union upon its request. The Board now petitions this court for enforcement of its order. The Union has intervened in these proceedings contending that the Board should have also affirmed the ALJ's finding that the cost-of-living adjustment was a permissive subject of bargaining over which the parties could not lawfully bargain to impasse.

## II.

■ We acknowledge the maxim that a decision of the Board should not be set aside if it is supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487, 71 S.Ct. 456, 463, 95 L.Ed. 456 (1951); *NLRB v. Lewis University*, 765 F.2d 616, 620 (7th Cir.1985); 29 U.S.C. § 160(f). Review of a Board decision requires that the court examine the entire record, "including the evidence opposed to the Board's view from which conflicting inferences reasonably could be drawn." *NLRB v. Adam and Eve Cosmetics, Inc.*, 567 F.2d 723, 727 (7th Cir.1977). Although the entire record is examined, judicial review of Board action is still "quite limited." *International Union of Operating Engineers v. NLRB*, 755 F.2d 78, 81 (7th Cir.1985). Even in those cases in which the reviewing court "would justifiably have made a different choice had the matter been before it *de novo*," the court is still obliged to uphold "the Board's choice between two fairly conflicting views...." *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465. Nonetheless, and recognizing that the findings of the Board "are entitled to respect," *id.* at 490, 71 S.Ct. at 466, this deference should never so blind the reviewing court that it becomes a mere rubber stamp substituting "judicial abdication for judicial review." *NLRB v. Truck Drivers,*

---

**3.** The ALJ found that the Respondents' unilateral actions with respect to the Christmas bonuses, parties and gifts to be in violation of the Act. The Board, to the contrary, ruled that such items were gifts, rather than terms and conditions of employment, and consequently that the Respondents' unilateral changes were lawful. Since this issue is not raised here, we express no opinion regarding its resolution.

*Oil Drivers, Etc.*, 630 F.2d 505, 507 (7th Cir.1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981). *Accord Atlas Metal Parts Co. v. NLRB*, 660 F.2d 304, 308 (7th Cir.1981). It is imperative that the reviewing court examine all of the evidence in context to ensure that the Board's findings fairly and accurately represent the picture painted by the record. With this in mind, we proceed to an examination of the Board's findings here.

▉▉▉ It is well-established that when an employer makes a claim of financial inability to pay a proposed wage rate, it generally has an obligation, in order to meet its duty to bargain in good faith, to provide substantiating financial data to its employees' bargaining representative upon request. *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 153, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956); *United Fire Proof Warehouse Co. v. NLRB*, 356 F.2d 494, 498 (7th Cir. 1966); *Craig and Hamilton Meat Co.*, 271 N.L.R.B. No. 135, 117 L.R.R.M. (BNA) 1210 (1984). "Although no magic words are required to express an inability to pay, the words and conduct must be specific enough to convey such a meaning." *Atlanta Hilton and Tower*, 271 N.L.R.B. No. 214, 117 L.R.R.M. (BNA) 1224, 1227 (1984). *Accord New York Printing Pressmen and Offset, Etc. v. NLRB*, 538 F.2d 496, 500 (2d Cir.1976). As the Board acknowledged at oral argument, the mere assertion by an employer that it is operating at a competitive disadvantage does not, in and of itself, constitute a claim of inability to pay. *Empire Terminal Warehouse Co.*, 151 N.L.R.B. 1359, 1360 (1965), *enforced sub nom. Dallas General Drivers, W. and H., Local No. 745 v. NLRB*, 355 F.2d 842 (D.C.Cir. 1966); *Charles E. Honaker*, 147 N.L.R.B. 1184, 1187–88 (1964). The relevant test, as articulated by this court, is to ascertain whether the employer said it "would not" as opposed to "could not" pay the employees' proposed demands.[4] *United Fire*

---

**4.** In several early decisions the Board had concluded that a claim of competitive disadvantage was itself a plea of inability to pay. *E.g., Cincinnati Cordage and Paper Co.*, 141 N.L.R.B. 72, 77 (1963); *Peerless Distributing Co.*, 144 N.L.R.B. 1510, 1514 (1963) (ruling that employer's claim that it was not pleading inability to pay but was resisting union demands out of a desire to remain competitive is "self-contradictory"; "if granting economic benefits would … have the effect of reducing [the employer's] competitiveness, it follows that the [employer] was asserting its financial inability to grant economic benefits") (footnote omitted); *Stockton District Kidney Bean Growers, Inc.*, 165 N.L.R.B. 223, 224–25 (1967). As conceded during oral argument, the Board apparently no longer subscribes to such a stringent view. Indeed, this court has already rejected the Board's once-held notion that a claim of competitive disadvantage was ipso facto a claim of inability to pay. *United Fire Proof Warehouse Co. v. NLRB*, 356 F.2d 494 (7th Cir.1966).

Two cases cited by the Board in its brief, *NLRB v. Celotex Corp.*, 364 F.2d 552 (5th Cir.), *cert. denied*, 385 U.S. 987, 87 S.Ct. 601, 17 L.Ed.2d 450 (1966) and *United Steelworkers of America, AFL–CIO, Local 5571 v. NLRB*, 401 F.2d 434 (D.C.Cir.1968), *cert. denied sub nom. Stanley-Artex Windows v. NLRB*, 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 465 (1969), *enforcing Stanley Building Specialties Co.*, 166 N.L.R.B. 984 (1967), are not to the contrary. Although we acknowledge there is language in these opinions that could be construed as supporting the

Board's position, we do not find the Board's reading of these decisions controlling here. In *Celotex*, for example, the court enforced a Board order finding that an employer had pleaded inability to pay when it insisted that concessions were necessary to make its "plant competitive *and to insure that plant's survival*," 364 F.2d at 553 (emphasis added), and not solely on the basis of a claim of competitive disadvantage. Indeed, the trial examiner found that the bargaining between the parties had taken place in the context of what wage rate the plant *"could* afford." *The Celotex Corp.*, 146 N.L.R.B. 48, 54 (1964) (emphasis added).

Similarly, in *United Steelworkers* (Burger, J.), the court, in enforcing a Board order finding that the employer had pleaded inability to pay, noted: "When the final wage offers were exchanged, the Company returned to its claim that the money to pay for the Union's proposal *just wasn't there.*" 401 F.2d at 436 (footnote omitted) (emphasis added). Again, the issue apparently was not that the employer "would not" pay, but rather that the employer "could not" pay.

Interestingly enough, however, the Board contended during oral argument that the *United Steelworkers* case stood for the proposition that a claim of competitive disadvantage was necessarily a claim of inability to pay, even though just earlier in its argument the Board had conceded that this could not rationally be the case. Moreover, the Board overlooks *Dallas General Drivers, W. and H., Local Union No. 745 v. NLRB*, 355 F.2d 842 (D.C.Cir.1966) (Burger, J.),

*Proof,* 356 F.2d at 498. Only in the latter situation where the employer communicated that it "could not" pay the demands has it made a claim of inability to pay. *See New York Printing Pressman,* 538 F.2d at 500; *Atlanta Hilton,* 271 N.L.R.B. No. 214, 117 L.R.R.M. (BNA) at 1227. *See also NLRB v. Unoco Apparel, Inc.,* 508 F.2d 1368, 1370 (5th Cir.1975) (holding that the employer's statement that the " 'employees came to the wrong well ... the well is dry' " constituted a plea of inability to pay). We must therefore determine whether the four Respondents here, in asserting that they were in a competitive disadvantageous position, were claiming they "would not pay" or whether they "could not pay" for the contractual provisions proposed by the Union.

■ Resolving this issue with respect to Respondent Duray is relatively simple. Although counsel for the Respondents argued in its brief and during oral argument that Duray had made no claim of inability to pay, Duray in fact concedes this point in its answer to the Board's complaint. *See* Answer to Consolidated Complaint XII(c). On this basis alone, we hold that there is substantial evidence to support the Board's finding that Respondent Duray pleaded inability to pay.

■ The question with respect to Respondents Harvstone, American and House-O-Lite cannot be disposed of as easily, however. In his opinion, which was summarily affirmed by the Board, the ALJ knitted together a smattering of words and phrases, and from this compilation derived

his finding that the Respondents pleaded inability to pay. A review of the record as a whole leads us to conclude, however, that the ALJ took much of the testimony out of context and that in the proper perspective the three Respondents, in seeking concessions, had not claimed inability to pay. The Respondents' position throughout was that they needed the concessions to be competitive; they never implied that they were financially unable, as opposed to unwilling, to meet the Union's demands.

The ALJ correctly points out that the Respondents' bargaining representative, Ray Schoonhoven, had disclosed that Duray was losing money. However, we believe that Duray's financial condition is not attributable to the other three Respondents as a means of finding that they pleaded inability to pay. There was never any confusion among the parties as to which company was losing money. Moreover, although negotiations were conducted jointly, the parties understood that each Respondent was ultimately an independent entity seeking its own contract with the Union. Duray's disclosure of its financial posture in this context is therefore irrelevant to the status of the other three Respondents.[5]

■ The ALJ in his decision also relies heavily on statements made by Schoonhoven during the course of the negotiations. For example, on one occasion Schoonhoven noted that if the Respondents "don't make a reasonable profit so they can be a viable competitive business, they won't stay in business, and no one will have jobs." Statements such as this one are, however,

---

that was decided by the same court that decided *United Steelworkers.* In *Dallas General,* in refusing to overturn a Board decision finding that an employer had not pleaded inability to pay, the court noted: "The Company's position on wages was not based on a claim of financial inability to pay but on the ground that it was paying rates in excess of prevailing rates of its competition in the same labor market." 355 F.2d at 845. In short, the court refused to find that a claim of competitive disadvantage was the equivalent of a plea of inability to pay. Since the *United Steelworkers* court does not overrule or even criticize the *Dallas General* decision, we must assume that *Dallas General* is

still good law and consistent with the reading of *United Steelworkers* noted above.

5. In any event, the Board has held that simply because an employer acknowledges the incurrence of losses does not necessarily place it in the posture of having pleaded inability to pay. *Vore Cinema Corp.,* 254 N.L.R.B. 1288, 1292 (1981) (ruling that an employer's proposal to reduce employee earnings in light of employer's comment that he had lost money in 1978 and did not intend to do so in 1979 and employer's statement that his final proposal was the "best offer he felt he could make" was not equivalent to a claim of inability to pay).

nothing more than truisms. Clearly, if an employer operates at a competitive disadvantage for a long enough time, its profit margin, as a matter of pure economics, will decline eventually forcing it out of business. There would then come a time when these three companies could be expected to plead inability to pay, but that time has not yet arrived. In context Schoonhoven's statements did not constitute a plea of inability to pay. The relevant time period we must concern ourselves with is that of the term of the new collective bargaining agreement. It is quite conceivable that an employer, already operating at a competitive disadvantage with respect to employee compensation, could afford to pay increased wages during the course of a new agreement. While it is axiomatic that this scenario cannot be played out indefinitely, it does not preclude a finding that, at least for the term of the new collective bargaining agreement, the employer operating at a competitive disadvantage is financially able, although perhaps unwilling, to pay increased wages. In such a case, we think that the employer's claim of competitive disadvantage is not a plea of inability to pay.[6]

After reviewing the record, we find that this is precisely the situation here. Respondents Harvstone, American and House-O-Lite, although acknowledging in response to Union inquiries that they could lose money and eventually go out of business if their competitive position did not improve, never communicated to the Union that they were financially unable to pay the Union's proposed demands for the duration of the new agreements. Rather, the record indicates that the Respondents were simply unwilling to meet the Union's demands. In short, "[w]here the evidence disclosed 'won't', the Board found 'can't.'" *United*

*Fire Proof,* 356 F.2d at 498. Accordingly, we hold that there is not substantial evidence to support the Board's conclusion that Harvstone, American and House-O-Lite bargained in bad faith by refusing to provide substantiating financial data after pleading inability to pay.

Respondent Duray, on the other hand, although conceding that it pleaded inability to pay, nonetheless contends that it too was under no obligation to disclose its financial records. Duray first argues that the Union's request for information was inadequate to give rise to its disclosure duty. Duray acknowledges that the Union did request to see financial documentation prior to the impasse that was reached on August 31. In fact, the parties stipulated that on August 26 the Union representative had asked the Respondents to "show us your books," and that the Respondents refused claiming that they were not "pleading poverty." Duray contends that since the Union's request was overly broad, was not zealously pursued and was not in writing that it was under no duty to disclose its financial records. We disagree.

There is no requirement that a request for financial records to substantiate a plea of inability to pay be in writing. *International Telephone and Telegraph Corp. v. NLRB,* 382 F.2d 366, 371 (3d Cir. 1967), *cert. denied,* 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1968). Moreover, we find that the Union's request was not so overly broad or vague that Duray could not reasonably have responded to it. Indeed, in *NLRB v. Bagel Bakers Council of Greater New York,* 434 F.2d 884 (2d Cir. 1970), *cert. denied,* 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648 (1971), the court found the following almost identical request sufficient to give rise to a duty to

---

**6.** To the extent that the foregoing is inconsistent with *Wheeling Pacific Co.,* 151 N.L.R.B. 1192, 1225 (1965) (ruling that the "basic principles which underlay *Truitt* cannot be considered less relevant merely because [the employer] may have expressed the view that wage increases would ultimately *lead to poverty,* rather than that such increases were precluded by *present* poverty") (emphasis in original), we disagree

with the Board's rationale in that case. Carried to its logical end, the Board's decision in *Wheeling* would transform any discussion by an employer of an unfavorable position vis-a-vis competitors into a plea of inability to pay. As even the Board concedes, this result stretches the logic of *Truitt* far beyond its rational limit. *See supra* p. 575.

disclose: " 'Bring your books to us. Bring an audit, accountant's report. Show us where you are losing money so we can guide ourselves and know in which direction we're going.' " 434 F.2d at 887. It is also clear from the record that Schoonhoven understood what the Union was seeking. He never once sought clarification regarding the Union's request; rather, his only response was that no plea of inability to pay had been made and that therefore no financial records would be forthcoming.[7] After reviewing the record, we conclude that Duray understood what financial information the Union was seeking and simply refused to disclose it; a more specific or detailed request would have been to no avail.

■ We also find no merit in Duray's argument that the Union's request was not made with sufficient zeal. The Union's zeal was minimal, but sufficient. Employees are not required to request the substantiating data on more than one occasion or hound the employer when the information is not produced. This is especially true where, as here, the employer fully understands that the employees are seeking substantiating documentation and yet simply refuses to deliver. Under these circumstances we find the Union's request of "show us your books" adequate to give rise to Duray's disclosure obligation.

■ Duray next argues that even if the Union's August 26 request was adequate, the Union waived the right to review the substantiating data on August 31. At the hearing, Schoonhoven admitted that he had stated at the August 31 meeting that Duray had lost $92,000 in the last six months and then had waved a document, which was purportedly Duray's profit and loss statement, in the air and asked if the Union wanted to see it. The Union's representative acknowledged, again according to Schoonhoven's testimony, that he would at some point want to see the document.

From this, Duray concludes that the Union waived its right to review substantiating financial data. We find Duray's contention without merit.

Without "a clear and unmistakable showing of a waiver" we are reluctant to deprive the Union of its right to examine Duray's financial records. *Tide Water Associated Oil Co.*, 85 N.L.R.B. 1096, 1098 (1949). Accord *Tucker Steel Corp., and Steel Supply Co.*, 134 N.L.R.B. 323, 332 (1961). There is no indication that the Union's representative even contemplated the possibility that his statement would be construed as a waiver of the Union's rights. Schoonhoven concedes, moreover, that he waved the profit and loss statement in the air merely as an "aside." Viewed in this context, the Union's conduct did not come close to constituting a "clear and unmistakable" waiver of its rights.

Nor did the Union's conduct serve to rescind its request for substantiating data. Duray argues that the August 26 request was at the very least nullified by the Union's refusal to examine the proffered data on August 31, and that after August 31 Duray was under no obligation to provide data absent a new request by the Union. We disagree. Duray, by its own admission, did not present the profit and loss statement to the Union in fulfillment of its disclosure obligation. Indeed, Schoonhoven contended throughout that he refused to disclose any financial data because there had been no plea of inability to pay. Simply because Duray later conceded that it had pleaded inability does not alter the fact it refused to disclose financial data not because the Union's request had been withdrawn, but because at the time Duray was contending that it had not pleaded inability to pay. Moreover, Duray produced no evidence establishing that the Union considered its request for information withdrawn. Under these circumstances, we find that the Union's August 26 request

7. The fact that Duray waited until after the unfair labor practice charges were filed to concede that it had pleaded inability to pay does not change our analysis. The simple fact is that Duray pleaded inability to pay and that it, given the proper request, was under an obligation to supply substantiating financial data.

was not rescinded by its actions on August 31.

Even if this were not true, Duray's rescission argument still lacks merit. Although Duray seeks to exonerate itself with this argument for the actions it took after August 31, Duray still remains unable to explain its refusal to supply the requested data between August 26 and August 31. The simple truth is that during this time the Union made the necessary request for substantiating data and Duray, in violation of the Act, refused to deliver.

██ Duray's next contention is that even if the Union properly requested information, its refusal to supply such data is not *per se* bad faith bargaining. Although there is language in the Supreme Court's decision in *Truitt* that might support Duray's position,[8] the general consensus today is that "for all practical purposes" a refusal to disclose alone constitutes a failure to bargain in good faith.[9] *Teleprompter Corp. v. NLRB*, 570 F.2d 4, 9 n. 2 (1st Cir.1977) (*citing, inter alia, C–B Buick v. NLRB*, 506 F.2d 1086, 1091 (3d Cir.1974); *NLRB v. Bagel Bakers Council*, 434 F.2d at 888; *NLRB v. Southland Cork Co.*, 342 F.2d 702, 706 (4th Cir.1965)). Even if this is not the case, Duray advances no additional circumstances that would justify our classifying its refusal as other than bad faith bargaining. *Cf. Western Massachusetts Electric Co. v. NLRB*, 589 F.2d 42, 47 (1st Cir.1978). Accordingly, we hold that there is substantial evidence to support the Board's conclusion that Duray violated sec-

tion 8(a)(5) and (1) of the Act by refusing to disclose its financial records.[10]

The final issue we consider is whether a cost-of-living adjustment accrued to the benefit of the Respondents' employees prior to the expiration of their bargaining agreements with the Union. The Union contends that the adjustment had accrued prior to the expiration of the agreements and that it was therefore a permissive subject of bargaining over which the parties could not bargain to impasse. The Union argues that the Respondents violated the Act by insisting on the elimination of this adjustment.

██ Before reaching the merits of the Union's argument, we must first acknowledge the Respondent's contention that the Union is not properly before this court. The Respondents argue that the Board's order gives the Union all of the relief it sought, even though the Board did not rely on the ALJ's finding that the cost-of-living adjustment accrued prior to August 31, 1982. The Respondents rely on section 10(f) of the Act which provides that only those persons "aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order...." 29 U.S.C. § 160(f). The Respondents contend that since the Union received all the relief it sought it is not an "aggrieved" party and should not be allowed to intervene in this proceeding. The Respondents fail, however, to distinguish between the right to

---

**8.** In limiting its decision in *Truitt*, the Court noted:

We do not hold, however, that in every case in which economic inability is raised as an argument against increased wages it automatically follows that the employees are entitled to substantiating evidence. Each case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met.

351 U.S. at 153–54, 76 S.Ct. at 756 (footnote omitted).

**9.** Our decision in *J.I. Case Co. v. NLRB*, 253 F.2d 149 (7th Cir.1958), is not to the contrary. In *J.I. Case* we simply noted that a union has, absent a

showing of relevance, no "'per se' right to information" it requests from an employer during the course of collective bargaining. *Id.* at 154–55. In the instant case, no question has been raised regarding the relevance of Duray's financial records. Indeed, since Duray conceded inability to pay, we may assume, absent a showing otherwise, that such records which substantiate its claim are relevant and should be disclosed.

**10.** Duray was not relieved of its obligation to disclose substantiating data by the Union's failure to bargain in good faith. Although Duray argues to the contrary, there is no evidence in the record indicating that the Union failed to engage in good faith bargaining as required by the Act.

*petition* for review and the right to *intervene* in ongoing proceedings. By its own terms, section 10(f) governs only the right to petition this court for review; it is silent as to a party's right to intervene after a petition for review is filed. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Scofield*, 382 U.S. 205, 209, 86 S.Ct. 373, 376, 15 L.Ed.2d 272 (1965). Contrary to the Respondents' position, the Supreme Court has held that a successful charging party, in this case the Union, has the right to intervene in proceedings either reviewing or enforcing an order of the Board. *Id.* at 208, 86 S.Ct. at 376. There is no requirement that the intervening party be "aggrieved" as that term is used in section 10(f). In short, the Union "should not be prejudiced by [its] success before the agency." *Id.* at 222, 86 S.Ct. at 384. We therefore hold that the Union is a proper party and is free to raise the cost-of-living adjustment issue in this proceeding.

Intrinsically, the adjustment issue itself involves nothing more than a debate over contractual interpretation. The collective bargaining agreements, which expired on August 31, 1982, provided that cost-of-living adjustments would be effective on each March 1 and September 1 during the life of the agreements. The amount of each adjustment was to be calculated based on changes in the CPI. The relevant review date of the CPI for the March 1 adjustment was the preceding January and the review date for the September 1 adjustment was the preceding July. The debate centers around whether the Respondents were obligated to make an adjustment effective September 1, 1982, even though the agreements between the parties expired on August 31, 1982.

The Union, arguing that the relevant point of reference is the July 1982 review date, maintains that since the changes in

11. The Union's reliance on *Struthers Wells Corp.,* 262 N.L.R.B. 1080 (1982), *modified,* 721 F.2d 465 (3d Cir.1983), is inapposite. In *Struthers* the court held that an employer did not violate the Act by refusing to grant a cost-of-living adjustment where both the review and effec-

the CPI took place during the life of the agreements, that the parties must have intended the adjustment to reflect these changes even though the actual adjustment was not effective until after the agreements expired. In support of its proposition the Union cites *Meilman Food Industries, Inc.,* 234 N.L.R.B. 698 (1978), *enforced without opinion,* 593 F.2d 1371 (D.C.Cir.1979).[11] In *Meilman,* the Board ruled that a cost-of-living adjustment had accrued to the employees' benefit even though its effective date fell after the expiration of the collective bargaining agreement. In so doing, however, the Board relied explicitly on the fact that the agreement clearly established that the relevant time for determining when the adjustment had accrued was the review date, which fell during the life of the agreement. 234 N.L. R.B. at 698, 704. Basing its decision on the specific language of the agreement, which "is clear on its face and requires no construction or interpretation beyond its plain meaning," the Board held that the adjustment was due and payable even though the effective date fell outside of the life of the agreement. *Id.*

Although the Union contends otherwise, the instant case differs from *Meilman.* The Union's agreements with the Respondents did not place importance on the review dates for determining when the cost-of-living adjustments actually accrued. Our reading of these agreements leads us to conclude that the January and July review dates were merely points of reference from which the amount of the adjustments was to be ascertained. There is no language in the agreements establishing the review dates as the time at which the cost-of-living adjustments became contractually enforceable rights in the hands of the employees. Indeed, unlike *Meilman* in which the review dates were definitively established as being each May 15 and November

tive dates were beyond the term of the collective bargaining agreement. *Id.* at 472. The court expressed no opinion as to the vitality of *Meilman* in the Third Circuit other than to note that *Meilman* was distinguishable from the case before it.

15, the review dates in the Respondents' agreements were to occur sometime following the publication of the CPI for the appropriate January or July. This lack of any established date for such review is further evidence that the review dates have no significance in determining the Respondents' obligations to pay cost-of-living adjustments. We therefore find that the Respondents' contractual duty to pay such adjustments arose, and the employees' rights to such adjustments accrued, only on the effective dates during the life of the agreements. Since the September 1, 1982, effective date occurred after the expiration of the collective bargaining agreements, the Respondents were not obligated to pay the adjustment in question.

Even conceding the above, the Union nonetheless contends that the adjustment actually became payable to the employees on August 30, 1982, just prior to the expiration of the agreements. To support its assertion, the Union relies on language contained in Art. XIX, § 4 of the agreements that mandated that the adjustment be paid beginning "on the first day of the pay week nearest the date on which the increase becomes due." The Union contends that since September 1, 1982, was a Wednesday that the adjustment, in accordance with the agreements, became payable to the employees on Monday, August 30. This argument, however, puts the cart before the horse. Pursuant to the agreements themselves, the adjustment was due on the first day of the week in which it became effective. What the Union's argument overlooks is that the adjustment in question here *never* became effective. Since no adjustment was due on September 1, the employees were not entitled to any increase on August 30. The Respondents did not violate the Act or their agreements by bargaining to an impasse over the cost-of-living adjustment.

### III.

We hold that the Board's finding that Respondents Harvstone, American and House-O-Lite violated section 8(a)(5) and (1) of the Act by refusing to disclose financial records after pleading inability to pay is not supported by substantial evidence. Furthermore, we find that all four Respondents did not violate the Act by bargaining to an impasse over the elimination of the cost-of-living adjustment. The unilateral changes in mandatory subjects of bargaining made by Harvstone, American and House-O-Lite, therefore, occurred after a *bona fide* impasse had been reached and were lawful under the Act. *See NLRB v. Katz*, 369 U.S. 736, 747–48, 82 S.Ct. 1107, 1113–14, 8 L.Ed.2d 230 (1962); *Atlas Metal Parts*, 660 F.2d at 309. Enforcement of the Board's order as it relates to Respondents Harvstone, American and House-O-Lite is accordingly denied.

With respect to Respondent Duray, we hold that there is substantial evidence to support the Board's finding that Duray pleaded inability to pay and thereafter refused, in violation of the Act, to provide substantiating financial data. The unilateral changes implemented by Duray were consequently made, also in contravention of the Act, prior to reaching a *bona fide* bargaining impasse. We therefore grant enforcement of the Board's order as it relates to Respondent Duray except insofar as it mandates the implementation of the September 1 cost-of-living adjustment. The Board's order, predicated on the erroneous conclusion that the adjustment accrued on August 30, 1982, requires Duray to make its employees "whole" by implementing the adjustment with interest. Since we find that the cost-of-living adjustment never accrued to Duray's employees, we deny enforcement of the Board's order as it relates to this adjustment.[12]

**12.** We are mindful of the fact that under the Act "an expired collective bargaining agreement continues to define the status quo as to wages and working conditions," and that this status quo must be maintained until a new agreement is reached or the parties negotiate in good faith to an impasse. *NLRB v. Cauthorne*, 691 F.2d 1023, 1025 (D.C.Cir.1982) (*citing NLRB v. Carilli*, 648 F.2d 1206, 1214 (9th Cir.1981)). In Duray's case, the status quo is defined as of August 31, 1982, when its collective bargaining agreement expired. Since no cost-of-living adjustment was

Enforcement denied as to Respondents Harvstone, American and House-O-Lite. The Board's order as to Respondent Duray is modified and enforced.

SWYGERT, Senior Circuit Judge, concurring in part and dissenting in part.

I concur with the enforcement of the Board's order as it applies to the Duray Company. I must, however, dissent from the denial of enforcement against Harvstone Manufacturing Company, American, and House-O-Lite.

The issue before us, as the majority states, is whether there is substantial evidence in the record as a whole to support the Board's findings. This case involves a difficult factual situation for the court to review. As Justice Burger, then Circuit Judge, said in *Dallas General Drivers, W & H Local No. 745 v. NLRB*, 355 F.2d 842, 844–45 (D.C.Cir.1966), in the whole complex of industrial relations there are few issues less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a Board which deals constantly with such problems. In the instant case, the administrative law judge and the Board had to draw inferences from a variety of verbal statements and documentary assertions made in the context of bargaining. Although the facts make this a fairly close case, I believe that the judge and the Board drew reasonable inferences which should not be disturbed by an appellate court.

The distinction which the Board had to make was a fine one: Did the employers make a claim of financial inability to pay a proposed wage rate? (If so, the employers potentially triggered an obligation on their part to provide substantiating financial data to their employees' bargaining representative. The disclosure is required to the extent necessary to permit a union to make a meaningful evaluation of the claim of financial inability. *Teleprompter Corp. v. NLRB*, 570 F.2d 4, 10 (1st Cir.1977).) Or,

did the employers indicate that they "would not" as opposed to "could not" pay the employees' proposed demands? (The Board recognized in *United Fire Proof Warehouse Co. v. NLRB*, 356 F.2d 494, 498 (7th Cir.1966), that such meeting-competition assertions are not necessarily the equivalent of inability-to-pay assertions and may not trigger an obligation to disclose. *Empire Terminal Warehouse Co.*, 151 N.L.R.B. 1359, 1360 (1965), enf'd, 355 F.2d 842 (D.C.Cir.1966); *Charles E. Honaker*, 147 N.L.R.B. 1184, 1187–88 (1964).)

The facts are crucial in cases which turn upon the inability-to-pay/refusal-to-pay distinction. The inquiry must always be whether, under the circumstances of the particular case, the statutory obligation to bargain in good faith has been met. *NLRB v. Truitt*, 351 U.S. 149, 153–54, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956). It is not necessary that the claim of inability-to-pay be expressed with any particular magic words. *Atlanta Hilton & Tower*, 271 N.L.R.B. No. 214, sl. op. at 7, 117 L.R.R.M. 1224, 1226 (1984). The statements must be judged within the context of the bargaining setting: if an employer's refusal to meet a wage demand reasonably interpreted is the result of financial inability to meet the employees' demands rather than simply unwillingness to do so, the exact formulation used by the employer in conveying this message is immaterial. *Id.*

Duray Company concededly raised a plea of "poverty" to support its claim of economic necessity for its demands to scale down the wages and benefits to its unit employees. Respondents' "Answer to Consolidated Complaint, XII(c)," denying allegations "except that Respondent Duray pleaded inability to pay." The facts are not as clear cut with respect to Harvstone, American, and House-O-Lite. Ray Schoonhoven, representing the employers, "skillfully avoided using the precise word 'poverty,'" according to the administrative law judge. In fact, Schoonhoven explicitly as-

due on that date, Duray will not be obligated to implement one after it resumes negotiations

with the Union pursuant to the Board's order.

serted that the employers were "not pleading poverty." Tr. 235. When asked whether the companies were claiming that they would be forced out of business if the unions would not forego reductions in labor costs, Schoonhoven replied: "No. They might or they might not." Tr. 166, 267. Additionally, Schoonhoven referred to the "business judgment" of the companies to seek relief, Tr. 165, 235, and the need to be "more closely aligned" with competitors' labor costs "to be competitive." Tr. 166, 169, 235–36.

Schoonhoven, however, did not make only these "meeting competition" or "would not pay" assertions. He coupled those statements with operating-loss/going-out-of-business assertions that amounted to "could not pay." The majority dismisses the Board's compilation of these "smattering of words and phrases" as being "out of context," and holds that the assertions never implied financial inability to meet the employees' demands (*see supra* at 576). I believe that the effect of all the statements taken as a whole and within the entire bargaining context could lead the union rationally to conclude that the companies were claiming financial inability to meet the union's demands.

First of all, it is undisputed that at the August 31, 1982 session, Schoonhoven stated that Duray Company was "losing money and had lost $92,000 during the past six months." Tr. 233, Schoonhoven; Tr. 320, Solomon, American Company; Tr. 326, Mayer, Duray Company. On this basis, the majority enforces the Board's order against Duray Company. But the majority does not believe that this clear assertion of a plea of poverty with respect to one employer is relevant to the position taken by the other three. Instead, it argues that Duray Company's financial condition is not attributable to the other three companies because there was "never any confusion among the parties as to which company was losing money." Although negotiations were conducted jointly, the majority states, the parties understood that each company was ultimately an independent entity seeking its own contract with the union. There-

fore, under this view, Duray Company's disclosure of its financial posture is irrelevant to the status of the other three.

I cannot agree that the plea of poverty by Duray Company is irrelevant to the position of the remaining companies. The companies had traditionally bargained separately with the union, but signed essentially identical contracts. During the negotiations for a contract to replace the one expiring in August 1982, the four employers were represented by the same attorney. Although each bargaining session was theoretically limited to a particular employer, the four employers and the union all treated the discussions at each bargaining session as relating to all four companies.

There was no attempt by Schoonhoven to separate the effect of the announcement that one company was losing money from the message he was conveying regarding the other three companies. Schoonhoven testified that he followed his reference to Duray Company's $92,000 loss with a "long discussion about competitiveness and if you don't make a profit, you can't be in business." Tr. 279. Schoonhoven explicitly stated that "one company was losing money and the rest might." Tr. 160, Moreland.

The majority characterizes these statements by Schoonhoven as mere "truisms." It states that the plea of poverty by Duray Company was irrelevant with respect to the other three employers represented at the August 31, 1982 bargaining session. Instead, I believe that Schoonhoven effectively coupled his "can't pay" assertion with other "won't pay" assertions to create a reasonable concern by the union that the employers *as a group* were raising financial inability to meet bargaining demands.

This same message was effectively conveyed to the union at other bargaining sessions. For example, Schoonhoven later asserted that "relief on labor costs" because of "poor competitive positions" was essential for the companies to "stay in business, [otherwise] no one will have jobs." Stipulation signed June 28, 1983, p. 13. He also stated that the companies

"need economic relief," Tr. 98, Lane, and that if economic concessions demanded by the companies were not met by the union, the companies "could, but ... not necessarily would ... go out of business." Tr. 101, Lane, December 21, 1982 bargaining session.

Immediately before negotiations commenced, two employers sent letters directly to their employees asserting that the wages paid them were higher than those of their competitors, and warning that "if we are going to continue in the Chicago area as a strong competing employer ... we must have a relief from this intolerable situation." The letters, drafted by Schoonhoven, also stated that "your future as well as the Company's will be vitally affected by these negotiations." Tr. 194, Joint Exhibits 18(a) and 18(b).*

Based on this documentary evidence, stipulations, and testimony, the Board concluded that although Schoonhoven had skillfully avoided using the "talismanic" word "poverty," he had triggered the requirement of fair substantiation during the collective bargaining sessions with respect to all the employers. I do believe that the Board's conclusion is supported by substantial evidence. The statements must be judged in the context of the bargaining setting, taken as a whole. Moreover, we should give weight to the administrative law judge's appraisal of the testimony he heard and appreciate his superior vantage point in gauging the demeanor of the witnesses.

I further believe that today's holding frustrates the statutory policy requiring substantiation of bargaining positions where necessary to allow peaceful, successful, collective bargaining. We condone the stratagem of maintaining a position during the bargaining and then denying such a position is in fact being taken when the opposing party demands substantiation.

Such "gamesmanship" is, in my view, encouraged by the majority's opinion. I respectfully dissent.

---

* During the November 24, 1982 bargaining session, the respondent employers for the first time proposed a change in the management rights clause, Article III, to the effect that the employers retained "the right to shut down or relocate the plant in whole or part and to select the site of any such relocation." Joint Exhibits 15(a)–(d). On the heels of the letters and the bargaining statements, this proposed change in language also could have rationally fueled union fears that the employers as a group were losing money and pleading inability to pay.