ATLAS METAL PARTS CO.,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Local 806, Allied Industrial Workers of
America, AFL–CIO (Union),
Intervenor-Respondent.

No. 80–2498.

United States Court of Appeals,
Seventh Circuit.

Argued May 29, 1981.

Decided Sept. 22, 1981.

James C. Mallien, Quarles & Brady, Milwaukee, Wis., for petitioner.

Sharon Margolis, Atty., N. L. R. B., Washington, D. C., for respondent.

Kenneth R. Loebel, Milwaukee, Wis., for intervenor-respondent.

Before PELL, Circuit Judge, MARKEY,* Chief Judge of the U.S. Court of Customs and Patent Appeals, and WOOD, Circuit Judge.

MARKEY, Chief Judge.

Atlas Metal Parts Co., Inc. (Atlas) petitions to review, and the National Labor Relations Board (board) cross-petitions to enforce, the board's order of September 17, 1980. The board found Atlas guilty of violating Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the National Labor Relations Act. We modify.

## BACKGROUND

### Negotiations

Atlas is a small shop, employing 35 persons in the preparation of metal parts for

---

* The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, is sitting by designation.

other manufacturers. In 1956, it recognized Local 806, Allied Industrial Workers of America, AFL–CIO (Union) as the collective-bargaining representative of its employees. Atlas and Union entered into successive collective-bargaining agreements, the most recent (the 1977 contract) covering March 1, 1977 to March 1, 1978.

Bargaining on a new agreement began February 1, 1978,[1] when Union proposed 24 changes in the 1977 contract. On February 15, Atlas countered with 36 proposed changes. During the next six weeks, the parties met five more times, engaging in the give and take of collective bargaining.

All contracts since 1957 contained a union security clause, requiring employees to join the Union and to maintain membership therein after 45 days of employment. Beginning in 1967, the contracts also provided for checkoff of union dues. Atlas wished to eliminate the security and checkoff provisions and to replace them with an affirmative freedom of choice provision concerning Union membership.[2]

By April 3, Atlas had retreated from 34 of its original demands and the only issues separating the parties were union security and checkoff.

On April 6, the employees struck. The parties met five times during the 13-week strike. At the first meeting, on April 20, Union submitted and Atlas agreed to four new proposals seeking guarantees for striking employees. Union security and checkoff continued, however, to separate the parties.

No progress was made on May 1 and 16. Union increased its wage demand on June 6, and its accident/sickness benefits demand on June 30. Atlas countered by reintroducing several original proposals on June 30.

By letter dated July 11, Union advised it was terminating the strike as of July 14, and offered on behalf of all striking em-

ployees to return to work on July 17. Atlas responded that it would recall returning strikers on a seniority basis as work became available. It did not offer to terminate replacement employees to make room for returning strikers.

On August 4, Union wrote to Atlas, requesting the names, dates of hire, and classifications of all active employees, and the names of employees who resigned or were terminated since the strike began. Union's letter included: "The Union further requests to know whether the Company has contracted out work, to whom and for how long. We are further requesting copies of any agreements of subcontracting." Union advanced no reasons for its requests. On August 7, Atlas replied that it would comply with the first two requests. Concerning the third, Atlas said, "with respect to contracting out work, the Company has done this for many years."

The parties met on seven more occasions between August 4, 1978 and February 13, 1979. During that period, Union dropped its proposals for union security and checkoff. Atlas adhered to several of its original proposals.

Between April 3, 1978 and February 6, 1979, Atlas took these unilateral actions on the dates indicated:

1. An April 3, 1978 wage increase of 7½ per cent to all employees;

2. A May 1, 1978 increase in accident and sickness benefit from $84 to $91 per week;

3. An August 1978 work rule change— suspension of the third step in the progressive disciplinary procedures for absences (namely, 3-day layoffs);

4. An October 1, 1978 wage increase to all employees of 3½ per cent;

5. An October 1, 1978 elimination of the AIW Pension Fund and unilater-

---

1. Events described in the text occurred in 1978 unless otherwise stated.

2. Atlas' proposed clause reads:
   The Union and the Company agree that whether an employee belongs to the Union or

doesn't belong to the Union is a matter of personal choice for each individual employee. Employees do not have to belong to the Union or pay a fee to the Union in order to work at the Company.

al grant of a wage increase in lieu thereof;

6. A February 6, 1979 implementation of a general wage increase of 4 per cent;

7. A February 6, 1979 increase of shift differential from 20 cents to 22 cents per hour;

8. A February 6, 1979 increase of life insurance coverage from $4,000 to $10,000;

9. A February 6, 1979 institution of payment for employees' safety glasses and increase from $5 to $7 in the allowance for safety shoes; and

10. A February 6, 1979 increase in direct payments to employees in lieu of payments to the AIW Pension Fund from 17 cents to 22 cents.

### Employee Behling

Behling was a Union signatory to the 1977 contract and chairman of the 1978 bargaining committee. Before the strike, he worked as a tool and die maker. After the strike he was reinstated as janitor-utility man, the best job then available. In late August, he applied for but was denied assignment as a truck driver. On September 10, he became a die grinder, at the established pay rate for that job. When Behling performed die-making tasks thereafter he was paid at the higher die-making rate.

### Barr's Remark to Behling

In August, Behling was talking with two other employees just before quitting time. Supervisor Barr, standing about 30 feet from Behling, yelled at him to stop talking about union business on company time.

### Employee Rigdon

Rigdon testified that in February, after he had succeeded in getting a job rerated by filing a grievance, supervisor Barr "told me that I should stop filing a grievance on jobs. And if I did that, I would make more money and things would run a lot smoother. And if I did not, he would give me . . . dirty jobs which means bad-rated jobs".

Rigdon testified that Barr repeated the statement in early March, after Rigdon had been successful in another grievance. According to Rigdon, Barr's assistant, Peltier, approached him and told him "basically the same thing as [Barr] told me in the morning".

### Proceedings

On September 29, complaints were issued based on charges filed by the Union under Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the Act. A hearing was held on May 7–10, 1979 before an Administrative Law Judge (ALJ). In his December 13, 1979 decision, the ALJ found that: (1) Atlas violated Section 8(a)(5) by negotiating without intent to reach agreement, by taking unilateral actions during negotiations, and by refusing to furnish information relevant and necessary to Union's representative function; (2) the strike was caused and prolonged by Atlas' bad faith bargaining; (3) Atlas violated Sections 8(a)(1) and 8(a)(3) by delaying employee Behling's reinstatement to the tool room until September 10, by reducing his wages at that time, and by denying him the position of truck driver; and (4) Atlas violated Section 8(a)(1) by promulgating a discriminatory rule against talking about the Union and by threatening employee Rigdon.

On September 17, 1980, the board affirmed the ALJ's findings and further found that Atlas violated Section 8(a)(1) and 8(a)(3) by discriminatorily denying reinstatement to unfair labor practice strikers who had unconditionally offered to return to work.

### OPINION

An order of the board will be enforced by this court if there is substantial evidence on the record as a whole supporting it. *N.L.R.B. v. Truck Drivers, Oil Drivers, Etc.*, 630 F.2d 505, 507 (7th Cir. 1980) and cases cited therein. We will not lightly disregard the evaluation of facts by the board "as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose

findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Due deference to the findings of the board, however, does not mean abdication of our duty of judicial review. *Id.* at 490; *N.L.R.B. v. Truck Drivers, Oil Drivers, Etc.*, 630 F.2d at 507; *Liberty Mutual Insurance Co. v. N.L.R.B.*, 592 F.2d 595, 602 (1st Cir. 1979). We are not empowered to rubber-stamp the board's order when, as here, review of the record shows that major portions of that order simply are not supported by substantial evidence. *N.L.R.B. v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723, 727 (7th Cir. 1977).

### Bad Faith Bargaining

■ The board's emphasis on Atlas' having agreed to union security and checkoff in prior contracts suggests the view that those provisions thus became sacrosanct and not subject to negotiation in future contracts. A "once in, forever in" concept, however, has no basis in logic or law. Indeed, the board's position would encourage employers to *oppose* union security, checkoff, and similar union-desired provisions in initial contracts, fearing that "once in", such provisions would be "forever in".

■ An employer is entitled to advance a position sincerely held,[3] notwithstanding the employer's having taken a different position at an earlier time. *N.L.R.B. v. Pacific Grinding Wheel Co.*, 572 F.2d 1343, 1348 (9th Cir. 1978). Union security and checkoff are mandatory subjects of bargaining, and "[a] party . . . is entitled to stand firm

on a position if he reasonably believes that it is fair and proper or that he has sufficient bargaining strength to force agreement by the other party". *N.L.R.B. v. Advanced Business Forms Corp.*, 474 F.2d 457, 467 (2d Cir. 1973). As stated by this court in *Capitol Aviation, Inc. v. N.L.R.B.*, 355 F.2d 875, 877 (7th Cir. 1966):

[T]hat the Union offered repeated modifications of its demand for a union security clause did not operate, as the Board seems to believe, to make Capitol's stand on freedom of choice for individual employees improper.

\* \* \* \* \* \*

The Board considered that Capitol's firm position on the union security and contract term issues outweighed its flexibility on more than 80 other issues, which the Board dismisses as equivalent to "concessions here and there".

■ Here, the board disregarded Atlas' concessions on 34 of its 36 proposals initially advanced. On the eve of the strike, Atlas was willing to reach agreement on all issues except union security and checkoff. With respect to those two issues, "refusal to bargain cannot be equated with 'refusal to recede from an announced position' advanced and maintained in good faith". *Church Point Wholesale Grocery Co.*, 215 N.L.R.B. 500, 502 (1974), *affirmed sub nom., Oil, Chemical and Atomic Workers International Union, AFL–CIO v. N.L.R.B.*, 538 F.2d 1199 (5th Cir. 1976).[4]

Moreover, Atlas presented uncontradicted evidence that its proposed clause on freedom of choice is virtually identical to the clause agreed to by another local of Union in a contract with another employer.[5]

---

3. Throughout bargaining, Atlas consistently asserted the same reason for wanting to eliminate union security and checkoff, viz., so that employees would have a free choice concerning Union membership.

4. The contrast between the instant facts and those in *N.L.R.B. v. Wright Motors, Inc.*, 603 F.2d 604 (7th Cir. 1979), relied on by the board, is illuminating. There, in finding bad faith, this court emphasized that the employer had made no bona fide concessions on substantial issues

and no defense of its extreme proposals, adhered to for six months.

5. In an August 22, 1977 agreement between S–B Manufacturing Co., Ltd. and Union's Local 659, the pertinent clause reads:

Neither the Company nor the Union will discriminate against or coerce or fine or discipline any employee because the employee:

2. Belongs to the Union, or
3. Doesn't belong to the Union.

Ignoring the evidence, the board arrived at a finding of bad faith by characterizing Atlas' freedom of choice proposal as "unreasonable, redundant and inflammatory" and as "predictably unacceptable" to the Union.

In *Chevron Oil Co. v. N.L.R.B.*, 442 F.2d 1067, 1072 n. 10 (5th Cir. 1971), a company's good faith was evidenced in part by its having successfully negotiated contracts containing the challenged provisions with three other affiliates of the same union. Similarly, in *Cagle's, Inc.*, 588 F.2d 943, 234 N.L.R.B. 1148, 1158 (1978), *enforced in part*, 588 F.2d 943 (5th Cir. 1979), the board held: "The Union having accepted this provision in the Macon contract, it cannot be said that Respondent's offer to incorporate it in the contract then being bargained for with the Union was of a type that 'no self-respecting union . . . could reasonably be expected to accept'".

■■ During the strike, Union increased its demands on wages and accident/sickness benefits, and Atlas responded by reintroducing several original proposals. The board condemned only the action of Atlas, ignored the conduct of Union, and disregarded the effect on the parties' relative economic strengths of Atlas' successful weathering of the strike. It is not illegal for a party to take advantage of a shift in economic strength in a bona fide attempt to obtain agreement on original proposals seen as furthering its best interest. Here, after the strike, it was not illegal for Atlas to use its dominant bargaining position in seeking contract terms most favorable to it.

The courts and the board have recognized that an employer's successful weathering of a strike changes the bargaining parties' positions. In *N.L.R.B. v. Alva Allen Industries, Inc.*, 369 F.2d 310, 318 (8th Cir. 1966), the court found no bad faith bargaining where the parties had reached agreement on about 80% of the issues, were apart on wages and union security when the employees struck, and negotiations continued but the employer remained adamant on union

Employees do not have to belong to the Union or pay a fee to the Union in order to work at the Company.

security, because "it is only natural that the Company, sensing its strong position, will bargain with increasing toughness and will be less inclined to make concession to the Union." Similarly, in *O'Malley Lumber Co.*, 234 N.L.R.B. 1171, 1179 (1978), the board said: "Where an employer's economic power increases through the successful weathering of a strike, it is not unlawful for an employer to use its new-found strength to secure contract terms that it deems beneficial".

We hold that the board's finding of bad faith bargaining by Atlas under Section 8(a)(5) is not supported by substantial evidence in the record as a whole, and accordingly deny enforcement of that portion of the board's order.

### Unilateral Changes

■ The board found that Atlas violated Section 8(a)(5) by unilaterally instituting changes in wages and other terms of employment without bargaining to impasse. That finding, however, rested on the board's unsupported finding of bad faith bargaining. Having bargained in good faith to impasse before instituting unilateral changes, Atlas was entitled to make those changes consistent with its last proposals during bargaining. *United Fire Proof Warehouse Co. v. N.L.R.B.*, 356 F.2d 494, 497 (7th Cir. 1966). Enforcement of the portion of the order relating to unilateral changes must therefore be denied.

### Subcontracting Information

■ The courts have held certain types of information, for example, wage data on unit employees, so intrinsic to the core of the employer-employee relationship as to be presumptively relevant. *Emeryville Research Center v. N.L.R.B.*, 441 F.2d 880, 887 (9th Cir. 1971); *Curtiss-Wright Corp. v. N.L.R.B.*, 347 F.2d 61, 69 (3d Cir. 1965). Unless the presumption is rebutted in such cases, an employer must provide the re-

Compare Atlas' proposed clause in note 2, *supra*.

quested information. Conversely, when the requested information is not ordinarily pertinent to a union's role as bargaining representative, but is alleged to have become pertinent under particular circumstances, the union has the burden of proving relevance before the employer must comply. *San Diego Newspaper Guild v. N.L.R.B.*, 548 F.2d 863, 867 (9th Cir. 1977).

■ Here, the board found that Atlas violated Section 8(a)(5) by refusing to furnish the requested information on subcontracting. Before us, the board is content to rely on the conclusory statement that "information as to subcontracting is presumptively relevant, such information is *prima facie* required to be produced and, rather than the Union being required to show the relevance of its request, the Company bears the burden of showing a lack of relevance". We disagree. We are cited to no evidence, and the record contains none, indicating that information on subcontracting is so intrinsic to the employer-employee core relationship as to make it presumptively relevant in all cases. That such information may be relevant under special circumstances seems clear but is of no moment here where no such special circumstances have been shown. Union made no effort to explain the relevance of the information sought in its letter of August 4, 1978, and no explanation was forthcoming thereafter. Absent some showing of a basis for holding the requested information so intrinsic as to be presumptively relevant, or a union showing of relevance, enforcement of that part of the order relating to a refusal to supply information must be denied.

### Reinstatement of Strikers

■■ The right to reinstatement of economic strikers differs from that of unfair labor practice strikers. An employer's responsibility to reinstate economic strikers is limited to the employer's legitimate staffing requirements. *Chauffeurs, Teamsters & Helpers "General" Local No. 200, AFL v. N.L.R.B.*, 233 F.2d 233, 238 (7th Cir. 1956). Upon an unconditional offer to return to work, unfair labor practice strikers are enti-

tled to immediate reinstatement to their former jobs or, if those no longer exist, to substantially equivalent positions. *N.L.R.B. v. Lyon & Ryan Ford, Inc.*, 647 F.2d 745, 754 (7th Cir. 1981).

■ The board found that the strike was caused and prolonged by Atlas' bad faith bargaining, making it an unfair labor practice strike. Accordingly, the board found Atlas obliged to offer immediate and full reinstatement to returning strikers, and held its failure to make room for them by terminating replacement employees a violation of Sections 8(a)(1) and 8(a)(3). We disagree. As above set forth, Atlas bargained in good faith before and during the strike. Hence there was no unfair labor practice and Atlas was entitled to treat returning strikers as economic strikers. There is no evidence that it failed to do so.

The board erroneously labelled Behling an unfair labor practice striker. Because he was an economic striker, Atlas was not required to ensure his immediate return to the tool room by discharging a replacement employee. Moreover, Atlas exercised legitimate business judgment in classifying him as a die grinder, not a die maker, when he did return to the tool room. Atlas President Fenlon testified without contradiction that, during the strike, Atlas began using a new type die not producible in its plant, and that there was correspondingly less work in the tool room. As the record shows, changed business conditions eliminated the need for full-time die makers and no one was employed in that position after the strike.

■ Finally, the board erred in finding a violation in the refusal to offer Behling a job as truck driver. An employer not motivated by anti-union animus may freely exercise its business judgment in hiring decisions, and the board should not substitute its judgment for the employer's. *N.L.R.B. v. Wells Fargo Armored Service Corp.*, 597 F.2d 7, 11 (1st Cir. 1979). Here, Atlas was aware in late August that a spot would open soon for Behling in the tool room, where he had worked previously and wished

to return. No warrant appears for requiring the training of two employees for the truck driver job. On September 10 Behling moved into the tool room. On the facts of record here, those parts of the order relating to reinstatement cannot be enforced.

#### Barr's Remark to Behling

Substantial evidence on the record as a whole supports the board's Section 8(a)(1) violation determination based on Barr's remark to Behling in August. As the board found, there was no previous rule against talking in Atlas' plant. Hence Barr's promulgation of a discriminatory rule prohibiting employees from talking about union matters constituted a violation.

#### Threats to Rigdon

Substantial evidence on the record as a whole supports the board's Section 8(a)(1) violation determination based on the threats to Rigdon. There were conflicts in the testimony of Rigdon, Barr, and Peltier. Nonetheless, the board properly accepted the view of the ALJ, who evaluated the demeanor and credibility of all the witnesses.

#### Conclusion

We modify the board's order [6] by deleting paragraphs 1(a), 1(b), 1(c), 1(e), 2(a), 2(b), 2(c), 2(d), 2(e), 2(f), and 2(g) thereof. We expect that the board will appropriately amend the "Notice to Employees" to be posted at Atlas' plant.

Enforcement is granted in part and denied in part.

MODIFIED, AND AS MODIFIED, ENFORCED.

---

**6.** The board added paragraphs 1(c), 1(e), and 2(d) to the ALJ's recommended order. We designate the resultant combination "the board's order".