# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 04-3156 & 04-3537

BRANDEIS MACHINERY & SUPPLY COMPANY,
a wholly owned subsidiary of BRAMCO, LLC,

*Petitioner*,
*Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent*,
*Cross-Petitioner*,

and

INTERNATIONAL UNION OF OPERATING
ENGINEERS LOCAL 150,

*Intervening Respondent*,
*Cross-Petitioner.*

_____

Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board.
No. 25-CA-28201
_____

ARGUED FEBRUARY 8, 2005—DECIDED JUNE 24, 2005
_____

Before RIPPLE, EVANS and WILLIAMS, *Circuit Judges*.

RIPPLE, *Circuit Judge.* In this petition, Brandeis Machinery
& Supply Company ("Brandeis" or the "Company") seeks

review of an order of the National Labor Relations Board ("NLRB" or the "Board"). The NLRB determined that Brandeis had violated the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. § 151 et seq., with respect to actions taken in response to union-organizing activities at its South Bend, Indiana facility. Brandeis timely petitioned for review of the Board's order, and the NLRB and the intervener, International Union of Operating Engineers (the "Union"), filed a cross-application for enforcement of the order. For the reasons set forth in this opinion, we deny the petition for review and grant enforcement of the Board's order.

# I

# BACKGROUND

## A. Facts

Brandeis sells and services heavy construction and mining equipment throughout Kentucky and Indiana. The Company is nonunion and explains its approach to "employee relations" at length in its employee handbook:

> We, as a Company, prefer to deal with people directly rather than through a third party. This is a non-union organization. It always has been and it is certainly our desire that it always will be that way. . . .
>
>     . . . .
>
> You have a right to join and belong to a union and you have an equal right NOT to join and belong to a union. If any other employee should interfere or try to coerce you into signing a union authorization card, please report it to your Supervisor and we will see that the harassment is stopped immediately.

A.R. Vol. III, General Counsel's ("G.C.") Ex.7 at 16.

In early 2000, Brandeis took steps to open a small branch office and service shop in South Bend, Indiana. Sam Freeman was chosen to be the manager for the office. Freeman hired Tom Muraski as the product support manager in charge of parts and service. From mid-2001 through February 2002, Freeman and Muraski interviewed and hired employees for the South Bend facility.

In December 2001, Muraski interviewed Bob Cook for the position of shop mechanic.[1] During the interview, Muraski inquired what union represented the employees at Cook's former employer. Muraski then told Cook that Brandeis was a nonunion company and that he could not foresee the Company going union in the future. Additionally, Muraski asked Cook how he felt about working for a nonunion company.

Muraski also interviewed Steve Benefield for the position of field service mechanic. Benefield was a long-time member of the Union and, like Cook, had been informed of the position at Brandeis through a Union organizer. Muraski did not inquire about Benefield's union membership during the initial interview. However, when Benefield was called back to interview with both Muraski and Freeman, Freeman recounted the history of Brandeis and told Benefield that Brandeis was nonunion and that Brandeis "would close the doors before they went union." A.R. Vol. II at 169. Benefield subsequently was hired and began work in March 2002.

In April 2002, Phil Overmyer, an organizer for the Union, told Cook to begin a campaign at the South Bend facility. Cook first spoke to Brandeis employee Ken Lubinski, who, after considering the matter overnight, informed Cook that

---

[1] Cook apparently had learned of the position through Union organizer David Fagan.

he was not interested in joining a union. Lubinski did not inform anyone at Brandeis about his conversation with Cook.

Cook next approached fellow mechanic Mike Karre. Over lunch on May 1, 2002, Cook informed Karre about union wages and benefits. Karre asked to meet with the Union's organizer, and, the following day, Karre met with Cook, Benefield and organizers Overmyer and Delbert Watson at a local restaurant.

On May 3, Karre went to lunch with Freeman and Muraski and informed them that Cook and Benefield had inquired about his (Karre's) interest in joining the Union. Freeman was caught off guard by the news. After returning to the office, Freeman called Benefield into his office to inform him that he and Karre would not be attending a scheduled training session in Atlanta, Georgia, but that they would attend a class in July.

Benefield believed the Company knew that a union campaign was afoot and contacted Overmyer shortly after his discussion with Freeman. Overmyer faxed Freeman notice that Cook and Benefield were Union members and were launching a union campaign at Brandeis' South Bend facility. Freeman then contacted Brandeis President Gene Snowden and Vice President of Operations Larry Shuck concerning the events that were taking place. Snowden and Shuck informed Freeman that they would contact legal counsel and instructed Freeman not to make any major personnel decisions without first consulting them.

On May 7, Cook and Benefield were working near Lubinski when Benefield commented that nobody was talking to Cook or to Benefield except for Lubinski. Lubinski— who had been approached by Overmyer at his home about the Union and had informed Overmyer repeatedly that he

was not interested in joining the Union—became upset and yelled at Benefield to stop talking to him and stop sending union organizers to his home. Another employee, Kevin Hardy, intervened and told Benefield to leave Lubinski alone or he (Hardy) might do something he would regret.

The following day, Lubinski complained to Freeman that Benefield was talking to him about the Union. Lubinski told Freeman that he wanted to avoid contact with Cook and Benefield unless such contact was related to work. In response, Freeman met with Benefield to discuss Lubinski's complaint. During that discussion, Benefield informed Freeman that Lubinski was the person who had escalated the discussion into a shouting match and that Hardy had threatened him (Benefield); Freeman instructed Benefield to stay away from Lubinski and stated that he would look into the matter of Hardy's threat. Later, Freeman informed Benefield that Hardy had not meant to threaten him; Hardy only meant "that he would quit his job" if the Union solicitations persisted. A.R. Vol. II at 180. Freeman then told Benefield that if he or Cook[2] needed to speak with either Lubinski or Hardy, they would have to do so through Muraski.

Snowden and Shuck arrived in South Bend and met with facility employees on the morning of May 8, 2002. During the meeting, they explained the Company's position with respect to the Union. Although Snowden had a written speech that he worked from, he did not follow his script verbatim. Cook secretly taped the meeting, which included the following comments by Snowden:

> Well they have the right to talk to you. If they want to

---

[2] Cook was present during these discussions as Benefield's Union representative.

> talk to you they can. But again you have the right not to listen. If they follow you on your property you have a right to tell them to leave the property. They don't have any right on your property if you don't want them on it. So, once again, if the union gets so aggressive that you feel you're being harassed, then we need to know about it because we will do everything within our legal means to keep you from being harassed.

A.R. Vol. III, G.C. Ex.12a at 2.

While Snowden and Shuck were visiting, a customer experienced transmission problems with a truck leased from Brandeis. All of the mechanics were at lunch at the time; consequently, Muraski attempted to assist the customer. Only a few minutes later, Karre returned from lunch and took over for Muraski. In light of these events, Shuck "suggested to [Freeman] that he consider staggering lunches so that these kinds of situations did not occur." A.R. Vol. II at 441. Freeman took Shuck's suggestion. On May 9, Freeman implemented a staggered and shortened lunch policy; according to the new policy, only one employee could be off for lunch at a given time, and the time allotted for lunch was shortened from one hour down to one-half hour.[3]

Also on May 9, Freeman observed that Benefield was wearing a union button on his uniform that covered the Brandeis logo. Freeman told Benefield that he did not appreciate Benefield wearing the button at work and asked him to remove the button from the Brandeis logo.[4] The fol

---

[3]  This arrangement apparently is the policy at the other Brandeis facilities.

[4]  Prior to this event, Freeman had made a comment to Cook
(continued...)

lowing week, on May 14, Muraski observed Cook wearing a union hat. Muraski, who was carrying a Brandeis hat, handed Cook the hat and told Cook that he might want to wear the Brandeis hat instead of a union hat. There were no repercussions for the employee for either incident.

Around this same time, Benefield had approached Karen Bailey, the office secretary, to gauge her interest in the Union. Bailey stated that she was not interested. Benefield then suggested that the Union could send a representative to speak to Bailey's husband, who owned his own excavation business, at their home. Bailey became upset and told Benefield: "I have to put up with you here. It is not coming to my house . . . . Don't send those people to my house, so help me God." A.R. Vol. II at 184.

Muraski had witnessed the end of the conversation between Bailey, who had begun her working day, and Benefield, who had not. Muraski approached Benefield and told him that it was his understanding that Benefield could not solicit other employees during their work time. Benefield then asked whether the rule prohibited him from discussing any subject with a fellow employee when the employee was working. Muraski replied, "No, about soliciting your stuff." A.R. Vol. III, G.C. Exs.18 & 19. When Benefield asked "what kind of stuff" Muraski was referring to, Muraski responded: "Your union." *Id.*

On May 10, Lubinski, Hardy and Bailey approached Freeman and indicated that they were angry with Benefield's and Cook's efforts to organize and preferred to be left alone. Freeman then had a discussion with Benefield. Freeman told Benefield that if he needed to talk to these

----

[4] (...continued)
about wearing a union hat.

people, Benefield would have to talk with either Muraski or himself. Freeman also stated that he "was just basically looking for a cooling down period. [He] didn't want to fight them right now." A.R. Vol. II at 316.

Bailey had another confrontation with Cook with respect to his union activities on May 31. Cook approached Bailey and asked her how things were going. Bailey ignored Cook, and Cook repeated his question. Bailey then informed Cook that she did not want to speak with him because the employees of Brandeis were not interested in joining a union. Bailey told Cook that it was ridiculous that he and Benefield did not respect the other employees' wishes. When Cook replied that the Union would be good for the employees and that Bailey was taking things too personally, Bailey directed a "few choice words" at Cook and left the room. A.R. Vol. II at 351. Bailey was reprimanded for using profanity and acting in an unprofessional manner.

## B. Administrative Proceedings

Based on these and other events,[5] the Union brought an unfair labor practice charge against Brandeis. On the basis of this charge, the NLRB's General Counsel issued a complaint against Brandeis in which it alleged violations of § 8(a)(1) and (3) of the NLRA. 29 U.S.C. § 158(a)(1) & (3). After a hearing, the Administrative Law Judge ("ALJ") con-

---

[5] The initial unfair labor charge brought against Brandeis included allegations that Brandeis had treated Benefield unfairly and, eventually, had terminated his employment as a result of his union affiliation. The Administrative Law Judge dismissed these allegations, and those allegations are not before this court. Consequently, those charges, and their factual bases, are not discussed in this opinion.

cluded that Brandeis engaged in several violations of the Act. Specifically, the ALJ held that Brandeis had violated § 8(a)(1) of the Act by engaging in the following conduct: (1) "[q]uestioning job applicants about their union membership and affiliation"; (2) "promulgating . . . a written policy that encourages employees to report to management any employees who solicit support for a union"; (3) "[t]hreatening job applicants with plant closure if employees chose to be represented by a union"; (4) "[v]erbally encouraging employees to report to management any employees who solicit support for a union and stating that [the Company] would put a stop to such union solicitation"; (5) "[p]rohibiting employees from wearing union buttons and union hats on the job during working hours"; and (5) "[v]erbally promulgating, maintaining and enforcing a rule that prohibits employees from discussing the Union during work time, while allowing non-union and non-work discussions during the same time." A.R. Vol. I, ALJ Dec. at 22. The ALJ also concluded that Brandeis had violated § 8(a)(3) of the Act by staggering lunch hours and shortening the lunch period in response to the Union's campaign efforts. The ALJ recommended that the Company cease and desist the violations and take affirmative steps to correct the violations.

Brandeis filed exceptions to the ALJ's decision with the NLRB. However, the NLRB adopted the decision of the ALJ and ordered the relief recommended by the ALJ.[6] Brandeis

---

[6] The NLRB adopted the ALJ's decision with only minor modifications. For instance, the NLRB affirmed the ALJ's determination that the incident involving the union hat constituted a violation of the NLRA. However, the NLRB explained that, "[b]ecause it would be cumulative of this violation to consider and
(continued...)

then petitioned this court for review of the NLRB's decision;[7] the NLRB filed a cross-application for enforcement of the order, and the Union intervened in support of the NLRB's application.

## II

## DISCUSSION

This court will enforce the NLRB's order "if its factual findings are supported by substantial evidence and its conclusions have a reasonable basis in law." *Bloomington-Normal Seating Co. v. NLRB*, 357 F.3d 692, 694 (7th Cir. 2004). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support' the Board's conclusion." *NLRB v. Clinton Elecs. Corp.*, 284 F.3d 731, 737 (7th Cir. 2002) (quoting *Nat'l By-Products, Inc. v. NLRB*, 931 F.2d 445, 451 (7th Cir. 1991)). We also "owe deference to the Board's inferences and conclusions drawn from the facts." *Id.* This deferential standard, however, is

---

[6] (...continued)

affirm the judge's finding that the Respondent additionally violated Sec. 8(a)(1) by prohibiting Benefield from wearing union insignia (a button) on his hat, and it would not affect the remedy, we find it unnecessary to pass on this latter allegation." A.R. Vol. I, NLRB Dec. at 1 n.7.

One member of the Board dissented from the Board's affirmance of the same issue. That member did not believe that the request to substitute the Brandeis hat for a union hat constituted a violation of the Act and believed it equally insupportable that the button incident constituted a violation.

[7] Brandeis' petition for review does not contest the Board's conclusion that the inquiries and statements concerning union involvement that occurred during the interviews conducted by Freeman and Muraski violated the Act.

not a rubber stamp; in conducting our review, "[w]e must 'examine all of the evidence in context to ensure the Board's findings fairly and accurately represent the picture painted by the record.' " *Id.* (quoting *NLRB v. Harvstone Mfg. Corp.,* 785 F.2d 570, 575 (7th Cir. 1986)). With this standard in mind, we turn to the issues raised by Brandeis in its petition.

### A. Handbook Language

Brandeis first maintains that the NLRB incorrectly concluded that its handbook section, which protects its employees from harassment by union organizers, violated § 8(a)(1) of the NLRA. The NLRB concluded that Brandeis' "policy statement invites the employees to report 'harassment' by union organizers attempting to get employees to sign authorization cards" and that "[i]t reasonably could be construed to mean that the conduct would be punished." A.R. Vol. I, NLRB Dec. at 4. According to Brandeis, however, the policy forwards the Company's legitimate goal of maintaining discipline in its facilities. Furthermore, Brandeis asserts, the provision is not so vague as to invite complaints of activities protected by the Act.

Section 8(a)(1) provides that "[i]t shall be an unfair labor practice for any employer . . . to interfere with, restrain, or coerce employees in the exercise of the right[]" to organize collectively under the Act. 29 U.S.C. § 158(a)(1). In order to establish a violation of this provision, "[n]o proof of coercive intent or effect is necessary . . . the test being whether the employer engaged in conduct, which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act." *NLRB v. Gen. Thermodynamics, Inc.,* 670 F.2d 719, 721 (7th Cir. 1981) (internal quotation marks and citations omitted).

One of the rights secured to employees under the Act is the right to solicit on behalf of a union organizing campaign. *See, e.g., Clinton Elecs. Corp.*, 284 F.3d at 739. Indeed, proponents of unions may "engage in persistent union solicitation even when it annoys or disturbs the employees who are being solicited." *Ryder Truck Rental, Inc.*, 341 N.L.R.B. 109, 2004 WL 963370, at *1 (N.L.R.B. April 30, 2004), *order enforced, Ryder Truck Rental v. NLRB*, 401 F.3d 815 (7th Cir. 2005). According to the Board, employers "interfere" with these rights, and therefore "violate Section 8(a)(1) of the Act, when they invite their employees to report instances of fellow employees' bothering, pressuring, abusing, or harassing them with union solicitations and imply that such conduct will be punished." *Greenfield Die & Mfg. Corp.*, 327 N.L.R.B. 237, 238 (1998). The rationale behind this rule is that "such announcements from the employer are calculated to chill even legitimate union solicitations, which do not lose their protection simply because a solicited employee rejects them and feels 'bothered' or 'harassed' or 'abused' when fellow workers seek to persuade him or her about the benefits of unionization." *Id.*[8]

This court, however, has rejected the type of "per se" approach adopted by the Board. "[O]ur cases demonstrate that a fact-based, contextual inquiry is required to determine whether a company has violated the NLRA."

---

[8] The Board has contrasted employer pronouncements against "harassment"—which violate the Act—with employer pronouncements against "threats"—which do not violate the Act. *See Liberty Nursing Homes, Inc.*, 245 N.L.R.B. 1194, 1197 (1979). Requesting that employees report union-related "threats," according to the Board, is "not reasonably subject to an interpretation that would violate the Act." *Battle Creek Health Sys.*, 341 N.L.R.B. 119, 2004 WL 1091058, at *24 (N.L.R.B. May 12, 2004).

*Bloomington-Normal*, 357 F.3d at 696. Factors to consider include: "the timing of the speech, the words used in the speech, whether the speech targeted union supporters, and whether the speech was directed toward employees who were being threatened." *Id.*

After considering the factors set forth above, we conclude that the NLRB's determination—that the Brandeis handbook language violates § 8(a)(1)—is supported by substantial evidence. First, the context of the Company's policy is important. The policy is located in a section of the handbook entitled "Employee Relations Philosophy," which details Brandeis' desire to remain union-free; it is not part of a more general anti-harassment policy. Second, the focus of the prohibition against "harassment" is union activity; there is no acknowledgment that opponents of a union may harass, interfere or coerce fellow employees into rejecting union representation. Thus, the language employed by Brandeis in its handbook stands in stark contrast to that approved by the Board in *S.E. Nichols, Inc.*, 284 N.L.R.B. 556 (1987), which provided: "*Remember, do not sign a card because you are threatened*, tell us and we will protect you. It is your right to have a union. It is your right not to have a union. Our Company will try to see to it that your rights are preserved no matter how you choose. Tell us if someone is trying to stop your freedom of choice." *Id.* at 557 (emphasis in original). The Board found that this language merely advised all of its employees—whether pro-union, anti-union or undecided—"that the Respondent would be available to protect employees from conduct that might restrain or coerce them in the exercise of their Section 7 rights." *Id.* The same "equal protection" guarantee does not appear in, and cannot be gleaned from, the language employed by Brandeis.

Furthermore, Brandeis' policy was not promulgated in response to threats or incidents of violence. When employers use terms such as "harassment" after employees have been threatened or encountered violence at the hands of union proponents, employees are less likely to perceive the term as referring to protected activity. Brandeis' policy, however, was part of its handbook, which was disseminated to employees when they were hired. Thus, Brandeis employees were not able to discern any limiting principles from the circumstances under which the policy was issued.

It is incumbent upon employers to use language that "is not reasonably subject to an interpretation that would unlawfully affect the exercise of Section 7 rights." *S.E. Nichols, Inc.*, 284 N.L.R.B. at 557. In the present case, neither the factual context nor the language employed by Brandeis served to limit employees' understanding of what constitutes harassment under the policy; employees reasonably could conclude that engaging in protected activity was tantamount to "harassment" under the policy. In light of these facts—that the policy was promulgated "without any knowledge of threats or harassment from the union, and targeted only union supporters"—"it was not unreasonable for the NLRB to conclude that the [policy] encouraged employees to report unionization efforts" in violation of § 8(a)(1). *Bloomington-Normal*, 357 F.3d at 697.

## B.  Snowden's Speech

Brandeis also urges us to revisit the NLRB's determination that Snowden's speech to the South Bend workforce on May 8, 2002, violated § 8(a)(1). During his speech, Snowden remarked:

> Well they have the right to talk to you. If they want to talk to you they can. But again you have the right not to

>listen. If they follow you on your property you have a
>right to tell them to leave the property. They don't have
>any right on your property if you don't want them on it.
>So, once again, if the union gets so aggressive that you
>feel you're being harassed, then we need to know about
>it because we will do everything within our legal means
>to keep you from being harassed.

A.R. Vol. III, G.C. Ex.12.

As noted above, although statements by management encouraging employees to report "harassment" in connection with a union solicitation is not per se violative of the Act, the context in which the statement is made must not be "so vague as to invite employees generally to inform on fellow workers who were engaged in union activity," *Liberty Nursing Homes, Inc.*, 245 N.L.R.B. 1194, 1197 (1979), and thus interfere with union proponents' rights under the Act. Although Snowden gave trespass as an example of behavior that is not protected, this example failed to enlighten Brandeis employees as to what did or did not constitute "harassment" at work. Employees easily could have been left with the impression that protected activity such as persistent solicitations, offers of union literature or invitations to organizational/informational meetings could constitute harassment.[9] In the absence of further guidance as to the meaning of "harassment," Brandeis employees were left to draw their own conclusions about the definition of "harassment"—a definition that well may have included activity protected by the NLRA. Thus, we conclude that the NLRB's determination that Snowden's statement was vio-

_____

[9] Indeed, although there is no evidence in the record that Cook and Benefield were engaging in something other than protected activity under the Act, their actions engendered a number of complaints to management.

lative of the Act is supported by substantial evidence.

### C. Commentary on Union Insignia

Brandeis similarly contests the NLRB's determination that the actions of Freeman and Muraski in commenting upon the union hat and buttons worn by Cook and Benefield violated § 8(a)(1) of the Act. The NLRB maintains that, in the absence of extenuating circumstances, i.e., a safety reason why union items cannot be worn or displayed, commentary of this sort by management violates § 8(a)(1).

This court has recognized that the Act guarantees employees the right "to wear union buttons or insignia as part of concerted activity to assist the union." *NLRB v. Shelby Mem'l Hosp.*, 1 F.3d 550, 565 (7th Cir. 1993). This right, however, is not absolute and may be "abridged when the employer demonstrates that special circumstances exist which justifies [sic] the banning of union insignia." *Eastern Omni Constructors, Inc. v. NLRB*, 170 F.3d 418, 424 (4th Cir. 1999). Countervailing interests such as employee safety, production or discipline may justify an employer's restrictions on such items. *See Shelby Mem'l Hosp.*, 1 F.3d at 565 (citing *Caterpillar Tractor Co. v. NLRB*, 230 F.2d 357, 359 (7th Cir. 1956)).

Brandeis does not attempt to justify the comments made in the present case on the grounds of safety, discipline or production. Instead, Brandeis maintains that the actions of Freeman and Muraski did not dissuade Cook or Benefield from touting the Union on their clothing, consequently, no violation of the Act occurred.

As noted above, however, the test for a violation of § 8(a)(1) is not whether the employer actually interfered with its employees' rights under the NLRA, but whether the employer's actions had a *tendency to interfere* with those

rights. *Gen. Thermodynamics, Inc.*, 670 F.2d at 721. Although Freeman's and Muraski's comments may not have discouraged Cook or Benefield from donning their union buttons and hats, the effect on possible onlookers may not have been so innocuous. These comments may have had a chilling effect on employees who otherwise would have displayed their support for the Union in some manner.[10]

Given that a showing of actual interference is not necessary to establish a § 8(a)(1) violation, we again conclude that the NLRB's determination is supported by substantial evidence.

## D. Prohibition of Discussion of Union

---

[10] If there had been only one stray comment by a member of management with respect to the display of union items, we may have reached the same conclusion as did the Fourth Circuit in *Eastern Omni Constructors, Inc. v. NLRB*, 170 F.3d 418, 425 (4th Cir. 1999). In that case, the Fourth Circuit addressed a company ban on union insignia placed on hardhats, but not other clothing items; the court commented: " 'Somewhere, in the vast human experience, there must be an inconvenience so minimally damaging, so utterly trivial, so profoundly petty, that it should not give rise to a [§ 8(a)(1) violation]. If so this is it.' " *Id.* at 426 (alteration in original; quoting *Beraho v. S. C. State Coll.*, 394 S.E.2d 28, 29 (1990) (Sanders, C.J., concurring)). In this case, however, both Freeman and Muraski made comments to Cook— on May 9, Freeman commented on Cook's button, and, on May 14, Muraski commented on Cook's hat. As well, Freeman commented on Benefield's pro-union button. Given that at least two members of management noted and commented upon the wearing of union attire and that the comments were directed to two different employees, we cannot dismiss these incidents as "so utterly trivial" as not to give rise to a § 8(a)(1) violation.

Brandeis also asks us to review the Board's determination that Muraski's oral prohibition of union discussions during work time violated § 8(a)(1). Brandeis argues that it was entitled to impose a rule that prohibits union solicitations in order to maintain productivity and discipline. The NLRB urges that the broad prohibition against union discussions cannot be justified on these grounds.

Brandeis does not dispute the general proposition that an employer violates § 8(a)(1) of the NLRA when it discriminatorily prohibits employees from discussing union-related topics during work time while tolerating other subjects of discussion. *See, e.g., Atlas Metal Parts Co., Inc. v. NLRB*, 660 F.2d 304, 311 (7th Cir. 1981). Brandeis, however, maintains that, in the absence of some evidence that anti-union animus motivated Muraski in prohibiting the discussions, the rule should have been sustained. Brandeis relies upon *Adtranz ABB Daimler-Benz Transportation, N.A., Inc. v. NLRB*, 253 F.3d 19 (D.C. Cir. 2001), in support of its position.

Brandeis' reliance on *Adtranz* is misplaced. In *Adtranz*, the company had a rule in its employee handbook against "soliciting and distribution without authorization." *Id.* at 28. The District of Columbia Circuit first noted that the rule in question only applied "to conduct during working time and in the work place." *Id.* The court continued: " 'Working time is for work' is a long accepted maxim of labor relations. Therefore rules prohibiting solicitation during working time are presumptively lawful because such rules imply that solicitation is permitted during nonworking time, a term that refers to the employees' own time." *Id.* (internal quotation marks and citations omitted). Furthermore, the court observed that Adtranz's rule was an "across the board" policy, and "there [wa]s no suggestion that anti-union animus motivated the policy" or that the rule "discriminate[d] against unionization efforts or other protected

activity." *Id.* at 29. Thus, among the court's reasons for sustaining Adtranz's "no solicitation" rule were that the rule was not intended to, nor was it enforced in such a manner as to, discriminate against speech or actions protected by the Act.

The same cannot be said regarding Muraski's instruction to Benefield that he and Cook refrain from discussing "union stuff." There is evidence that the statement was motivated by Benefield's and Cook's prior solicitation efforts, and there is no question that it targeted only future solicitations on behalf of the Union, as opposed to all speech during work time.

Brandeis is free to adopt nondiscriminatory policies that forward its legitimate objectives of maintaining plant productivity and discipline. However, those policies may not target, either through design or enforcement, activity protected by the Act. Because the oral rule promulgated by Muraski was directed only at discussions concerning the Union, the NLRB's conclusion that the prohibition violated the NLRA is supported by substantial evidence.

### E. Alteration of Lunch Policy

Finally, Brandeis claims that its alteration of the lunch policy was not a response to the Union's organizing activities that took place during the lunch hour. It was, instead, a legitimate response to the detrimental effect that an uniform lunch hour had on its ability to serve its customers' needs. The General Counsel urges that both the breadth of the policy, as well as the timing of its implementation, support the NLRB's conclusion that the change in policy

was in response to legitimate, protected activity.[11]

Section 8(a)(3) of the NLRA prohibits an employer from discriminating "in regard to hire or tenure of employment or any term or condition of employment to . . . discourage

---

[11] Specifically, the NLRB adopted the ALJ's determination with respect to this issue; the ALJ stated:

> A careful analysis of [the] situation, however, discloses that the changes imposed by the Respondent were not necessary to resolve the problem. According to Shuck, there was some-one available to render assistance to the customer, i.e., Muraski. Only 5 minutes passed before he was relieved by Karre, who quickly fixed the problem. Nor does the evidence disclose that this was an on-going or repeated problem or that similar situations were likely to occur in the future given the nature of the Respondent's business. For example, the field service mechanic for the most part is out of the building and most likely would not be available to render assistance, regardless of whether lunches were staggered and shortened. There are two in-house service mechanics, who normally do not perform field service work, but who conceivably could provide the type of coverage that Shuck envisioned if they, and they alone, staggered their lunch hours. But the changes imposed by Freeman went far beyond what was necessary to remedy Shrock's [sic] concern because the changes affected all employees, like Ken Lubinski and Kevin Hardy, who were not mechanics, and Benefield who was a field service mechanic. Indeed, the changes restricted everyone from taking lunch with anyone else and therefore stymied any attempts to organize during lunch time, which is when Cook and Benefield previously had spoken to employees one-on-one about joining the Union. Thus, I find that the Respondent has failed to persuasively show that in the absence of a union organizing drive, the changes that it imposed on lunch times would have been the same.

A.R. Vol. I, NLRB Dec. at 10.

membership in any labor organization." 29 U.S.C. § 158(a)(3). In order to establish a violation of § 8(a)(3), the "General Counsel must establish that antiunion animus was a motivating factor in the decision. If the General Counsel succeeds, the employer—to escape a finding of an unfair labor practice—must establish its affirmative defense— that it would have taken the action regardless for nondiscriminatory reasons." *NLRB v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1314 (7th Cir. 1998) (citing *Schaeff Inc. v. NLRB*, 113 F.3d 264, 267 n. 5 (D.C. Cir. 1997)).

In this case, the NLRB found that anti-union animus was a motivating factor behind the decision to change the lunch policy. The record establishes that the Union was using the lunch hour as a time to meet with potential members and convince them of the merits of unionization. Furthermore, the record shows that the Company became aware that active union recruitment was taking place during the lunch hour. The change in policy followed closely on the heels of Cook's and Benefield's lunch meetings with Karre and, according to the Board, made it "difficult for employees to take their lunches at the same time, and thereby inhibit[ed] the Union's organizing efforts." A.R. Vol. I, NLRB Dec. at 9. Thus, the record supports the NLRB's conclusion that union activity was a motivating factor in the change of policy.

Brandeis does not argue that the General Counsel failed to meet its initial burden of establishing that the union campaign was a motivating factor in the decision to alter the lunch policy. *See* Reply Br. at 15. Brandeis maintains, however, that it established that its actions were non-pretextual. It contends that, even in the absence of the Union's organizing campaign, the change would have been implemented because the uniform lunch hour deprived Brandeis of the necessary personnel to service customers, as evidenced by the events of May 8, 2002.

The NLRB counters that, if customer service was the driving force behind the change in policy, the policy should have been restricted to mechanics. However, "the changes restricted everyone from taking lunch with anyone else and therefore stymied any attempts to organize during lunch time, which is when Cook and Benefield previously had spoken to employees one-on-one about joining the Union." A.R. Vol. I, NLRB Dec. at 10. Furthermore, the General Counsel argues that "[q]uickly attending to repairs was not an ongoing problem at the facility and similar situations were not likely to occur." Respondent's Br. at 38.

Brandeis need not wait, however, until it has experienced persistent lapses in customer service before it adopts a policy that allows it to serve its customers in a more efficient and timely manner. Furthermore, we have no doubt that, at some level, Brandeis' lunch policy forwards that goal. Brandeis' burden, however, was not simply to establish that there was another, legitimate reason that motivated its action; Brandeis had to show that it would have taken the same action in the absence of the illicit motive. *See, e.g., NLRB v. Transp. Mgmt. Corp.,* 462 U.S. 393, 400-03 (1983) (upholding NLRB's construction of the Act that, after a showing that the employer's adverse action was motivated by anti-union animus, the burden was on the employer to show that it would have reached the same decision "had the forbidden motive not been present"), *abrogated on other grounds, Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries,* 512 U.S. 267 (1994); *Multi-Ad Servs., Inc. v. NLRB,* 255 F.3d 363, 371 (7th Cir. 2001) (stating that, if protected activity has motivated an adverse action, "a violation has been established unless the employer demonstrates that it would have taken the same action in the absence of the employee's protected activity"). The breadth of Brandeis' new lunch policy suggests that factors other

than customer service motivated its adoption. The policy applied to all employees, not just mechanics or service personnel. Furthermore, the policy not only staggered lunch periods, it also shortened lunch periods, thus making it more difficult for union organizers to meet with recruits during day-time hours. Consequently, we believe that the NLRB's conclusion—that Brandeis would not have adopted the same policy in the absence of union activity— is supported by substantial evidence.

## Conclusion

For the foregoing reasons, we deny Brandeis' petition for review, and we grant the cross-application for enforcement of the NLRB's order.

PETITION DENIED;
APPLICATION FOR ENFORCEMENT GRANTED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*